**ARMOUR AND COMPANY, a Delaware corporation, et al., Plaintiffs,**

**v.**

**B. Dale BALL, Director of Department of Agriculture of the State of Michigan, and Ronald M. Leach, Acting Chief of Food Inspection, Division of the Michigan Department of Agriculture, Defendants,**

**Frank J. Kelley, Attorney General of the State of Michigan, et al., Intervening Defendants.**

**Civ. A. No. 6250.**

United States District Court, W. D. Michigan, S. D.

Nov. 12, 1971.

Richard B. Foster, Sr., Foster, Lindemer, Swift & Collins, Lansing, Mich., for plaintiffs.

E. G. Robbins, Chicago, Ill., for Armour & Co.

Louis R. Simpson, Chicago, Ill., for Wilson & Co.

Byron M. Crippin, Jr., Austin, Minn., for Geo. A. Hormel & Co.

Frank Kelley, Atty. Gen., Maurice M. Moule, Lansing, Mich., for defendants.

Frank J. Kelley, Atty. Gen., Solomon Bienenfeld, Lansing, Mich., for State of Mich.

Stephen I. Schlossberg, Detroit, Mich., for International Union, UAW.

Kent Frizzell, Atty. Gen., Edward G. Collister, Jr., Topeka, Kan., for State of Kan.

John Milanowski, U. S. Atty., Grand Rapids, Mich., for the United States, amicus curiae.

## OPINION

FOX, Chief Judge.

Plaintiffs Armour and Company, Wilson and Co., Inc., and Geo. A. Hormel and Company brought this action against B. Dale Ball, the Director of the Michigan Department of Agriculture, and Ronald M. Leach, Acting Chief of the Food Inspection Division of the Michigan Department of Agriculture. They request the court to enjoin the defendants from enforcing the marketing, labeling, packaging and ingredient provisions of the Michigan Comminuted Meat Law, P.A.1952, No. 228, M.S.A. § 12.964 (1) et seq., M.C.L.A. § 289.581 et seq. and further ask the court to declare the Michigan Comminuted Meat law unconstitutional and therefore, unenforceable against the plaintiffs.

The preamble to the Michigan Comminuted Meat Act states that it is an act:

> providing for the protection of the public health and the prevention of fraud and deception by prohibiting the manufacture, sale, the offering for sale or exposing for sale or having in possession with intent to sell, sausage, meat loaf, hamburger, chili con carne, liver sausage, head cheese, sulze, blood sausage, New York (New England) (pressed luncheon), and tongue sausage, that is adulterated or deleterious or not in compliance with this act; defining the mentioned products and other terms used; providing for licensing; regulating labeling and advertising; prescribing penalties for violations of this act; and repealing certain acts and parts of acts.

Thus, the act focuses on the labeling and marketing of processed meats.

The United States Congress has likewise passed an act, the Federal Wholesome Meat Act, 21 U.S.C.App. § 601 et seq., regulating the labeling, marketing, inspection and other aspects of the meat industry.

The plaintiffs attack the Michigan Comminuted Meat Act on the basis of the Federal Wholesome Meat Act, claiming that the federal act entirely preempts the field of meat labeling and ingredient requirements. Specifically at issue in this case are Michigan's requirements that:

(1) Sausage and similar processed meat products be labeled "Grade I."

(2) All labels of such meat products carry the name of the manufacturer.

(3) Such meat products must contain at least 12% protein.

Central to the dispute in this case is the 12% protein requirement. The regulations promulgated under the Federal Wholesome Meat Act fail to provide for minimum protein content in processed meats such as sausage. The Michigan Act, however, provides "[t]he total percentage of protein shall not be less than 12%." M.S.A. § 12.964(2), M.C.L.A. § 289.582.

Furthermore, the Michigan act specifies that, "Grade 1 sausage shall consist only of skeletal fresh meat . . . of cattle, swine or sheep . . . or the striated muscle of chicken or turkey." Federal regulations, on the other hand, allow the use of hearts, tongues, tripe, lungs, melts, eyes, stomachs, udders, lips, ears, snouts, spleens, esophagus, glands, bladders, and paunches. (See appendix.)

Violation of the Michigan act is made a misdemeanor punishable by a $100.00 fine and/or 90 days in jail. Two convictions within a 12-month period result in a mandatory hearing before the director of Agriculture to determine whether the offender's license to sell sausage in the state should be revoked.

Plaintiffs call upon this court to enjoin state officials from enforcing the Michigan act and for a declaration of the act's invalidity.

## IRREPARABLE INJURY

 Standing as a fundamental concept of equity is the rule that an injunction will not issue unless the complaining party demonstrates irreparable injury. Here the plaintiffs seek to enjoin public officials from enforcing an act that imposes criminal sanctions. They assert that they are irreparably injured by the costs of complying with the Michigan act and by the threat to their licenses posed by possible prosecution under the act.

It has long been the general rule in federal courts that:

> " * * * equity will not interfere to prevent the enforcement of a criminal statute even though unconstitutional. Hygrade Provision Co. v. Sherman, 266 U.S. 497, 500 [45 S.Ct. 141, 69 L.Ed. 402]. See, also, In re Sawyer, 124 U.S. 200, 209–211 [8 S. Ct. 482, 31 L.Ed. 402]; Davis & Farnum Manufacturing Co. v. Los Angeles, 189 U.S. 207, 217 [23 S.Ct. 498, 47 L.Ed. 778]. To justify such inter-

ference there must be exceptional circumstances and a clear showing that an injunction is necessary in order to afford adequate protection of constitutional rights. See Terrace v. Thompson, 263 U.S. 197, 214 [44 S.Ct. 15, 68 L.Ed. 255]; Packard v. Banton, 264 U.S. 140, 143 [44 S.Ct. 257, 68 L.Ed. 596]; Tyson [& Bros. United Theatre Ticket Offices] v. Banton, 273 U.S. 418, 428 [47 S.Ct. 426, 71 L.Ed. 718, 58 A.L.R. 1236]; Cline v. Frink Dairy Co., 274 U.S. 445, 452 [47 S.Ct. 681, 71 L.Ed. 1146]; Ex parte Young, 209 U.S. 123, 161, 162 [28 S.Ct. 441, 52 L.Ed. 714, 13 L.R.A. (N.S.) 932, 14 Ann.Cas. 764]. *We have said that it must appear that 'the danger of irreparable loss is both great and immediate'; otherwise, the accused should first set up his defense in the state court, even though the validity of a statute is challenged."*

Spielman Motor Sales Co. v. Dodge, 295 U.S. 89, 95, 55 S.Ct. 678, 680, 79 L.Ed. 1322 (1935). (Emphasis supplied.)

In the Spielman case, Spielman Motor Company brought its action to restrain a threatened prosecution under the New York "Code of Fair Competition for the Motor Vehicle Retailing Trade." In holding that the plaintiff failed to demonstrate "irreparable damage" the court stated:

The bill alleged that appellant had a large business in buying and selling motor vehicles, but the statute did not prohibit the continuance of that business and the bill gave no facts to show that the particular requirements of the code, which were in question, would create such a serious interference as to require equitable relief. Aside from the statement of general and unsupported conclusions, the case presented by the bill was the ordinary one of a criminal prosecution which would afford appropriate opportunity for the assertion of appellant's rights.

295 U.S. at 96, 55 S.Ct. at 681.

■ Like the plaintiff in Spielman, the plaintiffs in this action fail to allege "such a serious interference as to require equitable relief." The plaintiffs in this case are threatened with criminal proceedings. They do not require, however, the protection of a Federal Court of equity to preserve their statutory and constitutional rights. Clearly the state court may be relied upon to preserve these rights.

The Supreme Court's most recent holding on the abstention doctrine relied heavily on the notion of irreparable injury. In Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the court reversed the District Court which had enjoined public officials from enforcing the California Criminal Syndicalism Act. The plaintiff in the Younger case was actually being prosecuted at the time he sued in Federal Court and the Supreme Court expressly stated that it made no judgment concerning abstention where criminal proceedings had not yet begun. This court likewise declines to make any statement concerning abstention where state criminal prosecutions are not yet begun.

■ Central to the court's holding in favor of abstention, however, was the concept of irreparable injury. The court's holding in Younger rested partly on the notion of comity with state courts and partly on the equitable concept of irreparable injury. 401 U.S. at 43–44, 91 S.Ct. 746. This concept is not limited to the abstention doctrine but applies in all cases wherein equitable relief is sought.

The Supreme Court concluded that Harris, who was being prosecuted under a statute later held unconstitutional by the District Court, failed to demonstrate irreparable injury. Thus, the court stated:

In Fenner v. Boykin, 271 U.S. 240 [46 S.Ct. 492, 70 L.Ed. 927] (1926), suit had been brought in the Federal District Court seeking to enjoin state prosecutions under a recently enacted state law that allegedly interfered with

the free flow of interstate commerce. The Court, in a unanimous opinion made clear that such a suit, *even with respect to state criminal proceedings not yet formally instituted, could be proper only under very special circumstances:*

"Ex parte Young, 209 U.S. 123 [28 S.Ct. 441, 52 L.Ed. 714], and following cases have established the doctrine that, when absolutely necessary for protection of constitutional rights, courts of the United States have power to enjoin state officers from instituting criminal actions. But this may not be done, except under extraordinary circumstances, *where the danger of irreparable loss is both great and immediate.* Ordinarily, there should be no interference with such officers; primarily, they are charged with the duty of prosecuting offenders against the laws of the state, and must decide when and how this is to be done. *The accused should first set up and rely upon his defense in the state courts, even though this involves a challenge of the validity of some statute, unless it plainly appears that this course would not afford adequate protection."* *Id.,* at 243–244 [46 S.Ct. at 493].

*These principles, made clear in the Fenner case, have been repeatedly followed and reaffirmed in other cases involving . threatened prosecutions.* See, e. g., Spielman Motor Sales Co. v. Dodge, 295 U.S. 89 [55 S.Ct. 678, 79 L.Ed. 1322] (1935); Beal v. Missouri Pac. R. Co., 312 U.S. 45 [61 S.Ct. 418, 85 L.Ed. 577] (1941); Watson v. Buck, 313 U.S. 387 [61 S.Ct. 962, 85 L.Ed. 1416] (1941); Williams v. Miller, 317 U.S. 599 [63 S.Ct. 258, 87 L. Ed. 489] (1942); Douglas v. City of Jeannette, 319 U.S. 157 [63 S.Ct. 877, 87 L.Ed. 1324] (1943).

401 U.S. at 45–46, 91 S.Ct. at 751. (Emphasis supplied.)

The court also stressed Watson v. Buck, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416 (1941), where the court said:

"Federal injunctions against state criminal statutes either in their entirety or with respect to their separate and distinct prohibitions, are not to be granted as a matter of course, *even if such statutes are unconstitutional.* 'No citizen or member of the community is immune from prosecution, in good faith, for his alleged criminal acts. The imminence of such a prosecution even though alleged to be unauthorized and *hence unlawful is not alone ground for relief in equity which exerts its extraordinary powers only to prevent irreparable injury to the plaintiff who seeks its aid.'* Beal v. Missouri Pacific Railroad Corp., 312 U.S. 45, 49 [61 S.Ct. 418, 420, 85 L.Ed. 577].

401 U.S. at 46, 91 S.Ct. at 751. (Emphasis supplied.)

■ Like the case presently before the court, the Fenner, Buck and the Spielman cases all relied on in Younger, were cases brought to challenge regulatory statutes. The import of these cases is clear; one is not irreparably injured because he must raise his challenge to the state statute as a defense to a state prosecution.

■ The court in Younger explained what would be regarded as irreparable injury. If the plaintiff is unable to protect his federal rights by defending a state prosecution he is irreparably injured. Thus, the court stated:

*In all of these cases the Court stressed the importance of showing irreparable injury, the traditional prerequisite to obtaining an injunction.*

\* \* \* \* \* \*

*Certain types of injury, in particular, the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution, could not by themselves be considered "irreparable" in the special legal sense of that term. Instead, the threat to the plaintiff's*

*federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution.*

401 U.S. at 46, 91 S.Ct. at 751. (Emphasis supplied.)

Plaintiffs in this case may adequately protect their federal rights in a defense to a state prosecution. Plaintiffs feel that the Federal Wholesome Meat Act gives them the right to disregard the Michigan law. In Younger the plaintiff felt the Federal Constitution gave him the right to disregard the California Criminal Syndicalism Act. In fact, the plaintiff in Younger relied upon the *"favored" right of freedom of speech.*

The Supreme Court has long asserted the "firstness of the First Amendment."[1] But the court held that whatever the merits of a given claim, a court of equity will enjoin enforcement of a state statute only where there is irreparable injury. And, as pointed out above, one is not irreparably injured so long as he may protect his federal rights in a state criminal proceeding. The court notes that the plaintiff in Younger was a person, a human being, and could suffer the substantial loss of personal liberty. Plaintiffs here, on the other hand, are artificial beings which face only the remote potential of losing their right to do business.

The plaintiffs allege irreparable injury in the threat the Michigan statute poses to their licenses. The statute provides for a mandatory hearing to consider the revocation of an offender's license only when a single offender is twice convicted within a single twelve-month period. Obviously plaintiffs have the opportunity to raise the issue presented here before the state court without endangering their licenses. A single "test" case should resolve the issue.

■ Plaintiffs also allege injury in the additional cost of compliance with the Michigan act. They claim additional costs of "$4.50 per hundred weight."

The plaintiffs make no allegation, however, that such additional *cost* results in financial *loss*. All sausage sold in the State of Michigan must comply with the Michigan law and there is no reason to believe that most, if not all, of the higher cost is not passed on to the consumer. At the most the record hints at a lost expectancy. Possible impediments to the maximization of profits is not a compelling justification for equitable relief.

An even more basic question, however, is whether the cost of compliance with this regulation may ever be considered "loss" or "injury." The plaintiffs in this case have operated under, and complied with, the provisions of the Michigan act since 1952. Now the plaintiffs claim that, by reason of federal law, they may be able to do less and are, therefore, irreparably injured by a law they have complied with, without question, for years. Suddenly the provisions of the Michigan act irreparably injure them. They seek the aid of a court of equity and good conscience to remove the impediment of the higher Michigan quality standards to maximize their profits.

■ If the cost of complying with a regulation amounts to irreparable injury then practically every state regulation may be challenged in Federal Court before the imposition of state criminal proceedings. Nearly all regulations impose cost burdens on the industries regulated. This cost of compliance may not be regarded as irreparable injury where no other factor is presented.

■ If the regulations were used for harassment or otherwise misused there may be grounds for equitable relief. Cf. Oswald Co. v. Leader, D.C., 20 F. Supp. 876 (1937). Irreparable injury would likewise result if the plaintiffs were forced out of the market while testing their contention in defense of a state prosecution. Toomer v. Witsell, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948).

Unlike plaintiffs in Toomer, however, the plaintiffs here are vast corporate

---

1. See E. Cahn, Confronting Injustic, 86–104 (1966).

entities not subject to imprisonment, and able to defend a state prosecution without forfeiting their market. Plaintiffs are not irreparably injured by this added cost because they may avoid it by simply disregarding the state statute. In reality plaintiffs invoke the equity jurisdiction of a federal court out of apprehension of losing a state prosecution. This is exactly what Younger v. Harris, supra, held not to be irreparable injury. Like the petitioner in Younger plaintiffs here cannot call their anxiety over possible loss in the state court such irreparable injury as to entitle him to federal equitable relief. Thus, plaintiffs' request for injunctive relief must be denied.

## DECLARATORY RELIEF

■ The plaintiffs herein also request a declaratory judgment. Generally, the same considerations that require the withholding of injunctive relief will make declaratory relief equally inappropriate. Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943); Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971).

In Great Lakes Dredge & Dock Co. v. Huffman, the court said:

"In our order granting the writ, we requested counsel 'to discuss in their briefs and on oral argument the question whether the declaratory judgment procedure can be appropriately used in this case where the complaint seeks a judgment against a state officer to prevent enforcement of a state statute'." 319 U.S. at 296, 63 S.Ct. at 1072.

The court concluded that the District Court had improperly considered the plaintiffs' complaint on the merits. The complaint should have been dismissed on traditional equitable grounds.

The jurisdiction of the district court in the present suit, praying an adjudication of rights in anticipation of their threatened infringement, is analogous to the equity jurisdiction in suits quia

timet or for a decree quieting title. See Nashville, C. & St. L. Ry. [Co.] v. Wallace, 288 U.S. 249, 263, 53 S.Ct. 345, 348, 77 L.Ed. 730 [735], 87 A.L.R. 1191. Called upon to adjudicate what is essentially an equitable cause of action, the district court was as free as in any other suit in equity to grant or withhold the relief prayed, upon equitable grounds. The Declaratory Judgments Act was not devised to deprive courts of their equity powers or of their freedom to withhold relief upon established equitable principles. It only provided a new form of procedure for the adjudication of rights in conformity to those principles.

319 U.S. at 300, 63 S.Ct. at 1074.

■ Thus, relief under the Declaratory Judgments Act is equitable relief and is subject to the generally established rules of equity. A district court is "as free as in any other suit in equity to grant or withhold the relief prayed, upon equitable grounds." 319 U.S. at 300, 63 S.Ct. at 1074.

Ordinarily, the practical effect of declaratory relief will be identical to that of injunctive relief. Samuels v. Mackell, 401 U.S. 66, at 73, 91 S.Ct. 764, 27 L.Ed. 2d 688. Those reasons which compel this court to deny injunctive relief likewise require denial of plaintiffs' request for declaratory relief. For the reasons heretofore stated the plaintiffs' request is denied.

Although this court has found that it may not exercise its equity jurisdiction due to the lack of irreparable injury, it cannot help but note the plaintiffs' posture in this case. Plaintiffs have stipulated that the standards established under the Federal Wholesome Meat Act are minimum standards, not maximums. Compliance with the Michigan act *is* compliance with the Federal Act. Plaintiffs Armour and Co., Wilson & Co., and Geo. A. Hormel & Company demand the right to do no more than the minimum required by the Federal Act. They seek to avoid the admittedly higher standards of the Michigan act, while offering as

their sole reason the maximization of corporate profits. No law *requires* that plaintiffs lower their standards. The decision to do so is that of the plaintiffs and no one else.

Plaintiffs' counsel admitted on oral argument that such a lowering of standards is inequitable but argues that to the extent that Congress has acted inequitably the plaintiffs have the right to pursue it. This court certainly recognizes that it may not review the equities of the Congressional action relevant to this case. But it likewise recognizes the lack of equity in the plaintiffs. If Congress has acted inequitably the plaintiffs intend to take full advantage of it. The court notes that while the plaintiffs argue that the Federal Act operates to lower the Michigan standards, a major intent and purpose of the Federal Act was to raise the practically non-existent standards of many other states. The Federal Act was needed to force meat packing companies to meet their obligations to consumers. Congress felt that meat packing companies were unwilling to voluntarily act in the public interest and thus passed a law forcing them to meet their public obligations. It is indeed unfortunate that the plaintiffs' fervor for profits make them the prisoner of inequity.

It is an historical certainty that one who seeks equity must as a prerequisite have equity and good conscience. Plaintiffs have neither in this case.

For the reasons stated in this opinion, plaintiffs' motion for summary judgment is hereby denied, and defendants' motion for summary judgment is hereby granted.

It is so ordered.

### APPENDIX "A"

COMPARISON BETWEEN THE MICHIGAN COMMINUTED MEAT LAW AND THE REGULATIONS UNDER THE U. S. DEPARTMENT OF AGRICULTURE

First of all, a few definitions will be necessary to fully understand the various terms as they are used in both the Michigan law and the Federal regulation.

In the Michigan law—*Meat* is defined as the properly dressed, clean, sound flesh derived from cattle, swine or sheep sufficiently mature and in good health at the time of slaughter. *Skeletal Meat* is defined as being any clean edible part of striated muscle including head meat and cheek meat

In comparison, the Federal regulation defines *Meat* as part of the muscle of any cattle, swine, sheep or goats which is skeletal, or which is found in the tongue, in the diaphragm in the heart or in the esophagus.

Another term used is *Meat By-Product*. This is defined by Federal as being any part capable of use as human food *other than meat* which has been derived from one or more cattle, swine, sheep or goats. Federal *Meat food product*—any article capable of being used as human food which is made wholly or in part from any meat product of cattle, swine, sheep or goats.

Immediately you will notice here that the definition for meat in the Michigan law is a lot more strict than that used in the Federal regulation. The Federal regulation permits in products the meat found in the tongue, diaphragm, heart and esophagus. In addition, the meat from goats may be used, which is not permitted in the Michigan law.

*Comparison Between the Michigan Comminuted Meat Law and the Regulations under the U. S. Department of Agriculture*

The first comparison we will make here is the fresh sausage. In the Michigan Act this is referred to as pork sausage, breakfast sausage or roasted sausage. These may not contain more than 45% trimmable fat and may not contain any added water or ice. The Federal regulation on this same product permits 50% trimmable fat and 3% added water.

The next area we will consider is Michigan Grade 1 sausage; such products being weiners, bologna, ring bologna, knackwurst, beer salami, cooked

salami, polish sausage, etc. Federal includes practically the same group of products—frankfurters, weiners, Vienna bologna, garlic bologna, knackwurst, and similar products.

The Michigan law requires that Grade 1 sausage consist of only skeletal fresh meat prepared from the animal carcass of cattle, swine or sheep, or a mixture of such meats, with no water added, nor vegetable protein, cereal or vegetable flours and soya flour. Michigan permits up to 4% non-fat dry milk to be used as a binder. However, this dry milk cannot be used in "all meat" products.

Federal regulations permit 10% added water, cereal fillers, and concentrated soya protein to be added to the product. In addition Federal provides for such things as cheesefurters, and products of a similar nature, in casings which make them resemble frankfurters, except they contain sufficient amounts of cheese or other foods which de-characterize the good old American "Hot Dog." Federal permits artificially colored casings for these commodities which makes the product appear better than what it really is. Michigan permits this only in artificial or non-edible type casings. Federal permits it in the natural casings also which, of course, are edible.

The use of beef fatty tissues which have been partially defatted is permitted by the Federal regulation in practically all products covered here. Michigan does not permit this type of material since its reclaiming process is of dubious value being a rendering type operation thereby salvaging the fibers within the fat portions of the carcass and converting them to use as a meat product.

In Michigan there is a difference between hamburger and ground beef. Federal regulations do not provide for ground beef. However, they do provide for chopped beef, beef patties, fabricated beef steaks, and other such fanciful names that could better be identified as either hamburger or ground beef. The Federal regulation permits seasoning in both of these products, where the Michigan law permits only the addition of

Monosodium Glutamate if properly labeled as containing this additive. Since November of 1969 the Federal regulations permit 15% of poultry meat, including the normal ratio of skin therefrom, in products formerly limited to be made from beef, pork, lamb, mutton or goats without declaring the presence on the labels. Michigan permits sausage products made solely from poultry but does not permit the mixture of poultry with beef, pork, lamb or mutton in sausage products. "Chicken sausage or turkey sausage," to be legal in Michigan, must be made without beef, pork, lamb or mutton added. Such products must be labeled "chicken sausage or turkey sausage" or whatever the true facts indicate. These products may include the normal ratio of skin from the poultry.

In conclusion, the organ meat permitted by Federal regulation includes the muscle from the tongue, diaphragm, heart, esophagus and also the meat in lips, snouts and ears. Michigan Grade 1 permits only skeletal meat which is the clean edible part of striated muscle, including head and cheek meat.

In the matter of labeling, Michigan requires the true name of the manufacturer of any of these products to be included on the label, where the Federal regulation permits terms as "packed for," "distributed by" and thereby does not indicate the true name of the manufacturer of these products. This is important in law enforcement work because any product that contains illegal ingredients, must revert to the true manufacturer who is responsible for the addition of such illegal additives.

APPENDIX "A–1"

SUPPLEMENT TO
COMPARISON BETWEEN MICHIGAN COMMINUTED MEAT LAW AND USDA REGULATIONS

(As Recommended by Department Laboratory Division)

Soya Protein concentrates are considered as a source of inferior protein of lower nutritional value. It is an econom-

ic factor also since these vegetable proteins are a much cheaper protein than those derived from meats. There is no official method to determine the amount of vegetable proteins added thereby encouraging economic cheating.

The 12% protein required by the Michigan act and the exclusion of cereal, starches and other fillers limits the fat content in these products. These fillers absorb fat, thereby enhancing the addition of fat to Federal products up to 30%. Michigan Department of Agriculture laboratory statistics show that most Michigan Grade 1 products are well below the Federal limit of 30%

Official Michigan Department of Agriculture laboratory reports on 100 samples of Michigan Grade 1 frankfurters selected at random averaged 26.59% fat content while Federal permits 30% held in the product by the addition of cereal, starches, etc. as fillers.

With no Federal requirement for percent of protein it is conceivable that Federal products could be made with very little or no good red meat protein in the product. The Federal product would be of much less economic and nutritional value due to the use of inferior vegetable proteins in place of meat proteins.

By definition, in the Federal regulation "Meat By-Products" and "Meat Food Products" include stomaches, melts, hearts, eyes, lips, snouts, spleens, esophagus, glands, lungs, bladders, paunches, udders and all other undesirable parts of animals. Michigan requires skeletal meat with none of the above permitted.

Michigan permits 4% added dry milk as a binder to some products, which will absorb approximately four times its weight in moisture, while Federal permits cereal and soya concentrates which have a much higher absorption capability. Thereby the Federal product permits added non-meat bulk and excessive water, an economic factor when water and cereal and other plant material is sold at meat prices.

The product resulting from "partially defatted beef fatty tissues" is bet-

ter known as cracklings. This is accomplished by rendering the fat from tissues by heat and other processes and this residue, known as cracklings or crackling meal, is permitted in Federal products. Cracklings or crackling meal are specifically prohibited under the Michigan act.