**AMERICAN MEAT INSTITUTE,**
**Plaintiff,**

v.

**B. Dale BALL, Director of Michigan State Department of Agriculture, and Ronald M. Leach, Chief of Food Inspection Division of Michigan State Department of Agriculture, Defendants.**

**No. G75–39 C.A.**

United States District Court,
W. D. Michigan, S. D.

Nov. 26, 1976.

Richard B. Foster, Foster, Lindemer, Swift & Collins, Lansing, Mich., for plaintiff.

Robert Ianni, Asst. Atty. Gen., Lansing, Mich., for defendants.

## OPINION

FOX, Chief Judge.

The American Meat Institute, a national trade association of the meat packing industry, has filed this suit for declaratory judgment, challenging Section 4a of the Michigan Comminuted Meat Law, M.S.A. § 12.-964(4.1); M.C.L.A. § 289.584a. That section requires grocers and restauranteurs who sell meat and meat products whose ingredients do not meet the standards set by the State of Michigan for similar products produced and sold solely within the state to notify consumers of that fact in a prescribed fashion.

The defendants are the director of the State Department of Agriculture and the Chief of the Food Inspection Division of that department. They initially moved to have the complaint dismissed on the grounds that the plaintiff association lacked standing to sue and that this was actually a suit against the state, barred by sovereign immunity in the absence of consent, and improperly brought against the named officials. However, at oral argument the defendants abandoned these contentions, agreeing with the court that they were unfounded.

*History of the Case.*

This suit is largely an outgrowth of earlier litigation between corporate meat packers and the State of Michigan, which likewise concerned an alleged conflict between

state and federal regulations. Since the Michigan Comminuted Meat Law was passed in 1952, the state has had minimum ingredient requirements for various meat products. Similar standards in many other states were practically nonexistent. In 1967, in an attempt to protect consumers by establishing uniform ingredient standards nationwide, Congress enacted the Federal Wholesome Meat Act (FWMA), 21 U.S.C. § 601 et seq. The federal act, and regulations passed pursuant to it allow manufacturers to include in their products a number of animal parts which could not be used under Michigan's law, such as hearts, tongues, melts, stomachs, udders, esophagae, lips, ears, spleens, snouts, bladders, paunches, and salivary and other glands.

In 1970, three meat packing corporations brought suit for declaratory and injunctive relief against appropriate state officials to prevent enforcement of the marking, labeling, and ingredient standards of the Michigan statute. Plaintiffs claimed that these standards were preempted by the Federal Wholesome Meat Act. Finding that plaintiffs were being threatened with state criminal prosecutions,[1] and further that they had not shown irreparable harm, I exercised equitable restraint and deferred to the state courts in accord with the principles enunciated by the Supreme Court in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and other decisions, particularly, *Spielman Motor Sales Co. v. Dodge*, 295 U.S. 89, 55 S.Ct. 678, 79 L.Ed. 1322 (1935). Specifically, I held that:

"The plaintiffs in this case are threatened with criminal proceedings. They do not require, however, the protection of a Federal Court of equity to preserve their statutory and constitutional rights. Clearly the state court may be relied upon to preserve these rights." *Armour and Company v. Ball*, 337 F.Supp. 938, 941 (W.D.Mich.1971).

Accordingly, I denied plaintiff's motion for summary judgment and granted defendants' motion for summary judgment. The Sixth Circuit Court of Appeals reversed, holding that this court "erred in its determination of the inappropriateness of declaratory relief and in refraining from ruling on the appellants' claim of preemption." 468 F.2d at 79. The Court of Appeals held that the constraints on exercising federal jurisdiction applied when there was a "pending state proceeding," and construed this phrase to mean "a proceeding under state law that is *pending when a complaint is filed in federal court* seeking declaratory or injunctive relief from the application of that state law." Id. [Emphasis supplied.] Although the court found that "(e)nforcement of the Michigan Law against the appellants is not just a threat," because "[r]epetitive enforcement of the law's criminal sanctions is occurring and its continuing enforcement is promised," it nonetheless ruled that "No state prosecution under the Michigan law was *pending* against the appellants when they filed their present action."[2] [Emphasis supplied.] Younger-

---

1. As noted by the Sixth Circuit in its opinion, Armour and Company was prosecuted under the Michigan law in 1968. The company pleaded guilty and paid a fine. Subsequent to the filing of the complaint in the first "meat case," on January 13, 1970, prosecutions under the Michigan law had been commenced by the state against Armour Dial, Inc., a subsidiary of Armour and Company, and Armour and Company. Both prosecutions were held in abeyance pending outcome of that case. *Armour and Company v. Ball*, 468 F.2d 76, 78 (6th Cir. 1972).

2. After the Sixth Circuit's decision reversing this court on the ground that equitable restraint was unwarranted where no prosecution was pending on the date the complaint was

filed, the Supreme Court decided *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). In that case the Court held that where state criminal proceedings are begun against federal plaintiffs *after* the federal complaint is filed but before any proceedings of substance have taken place in the federal court, the principles of *Younger v. Harris* should apply full force. 422 U.S. at 349, 95 S.Ct. 2281. Cf. *Louisville Area Inter-Faith Committee for United Farm Workers v. Nottingham Liquors, Ltd.*, 542 F.2d 652 (6th Cir., decided and filed September 29, 1976). While it thus appears in retrospect that this court was correct, at least in anticipating the course of the law, the factual record in our earlier case was not sufficiently developed to permit re-examination of the matter, and in any event, it is immaterial now.

type "abstention" was therefore held to be inappropriate. Turning to the merits, which this court had not decided, the Sixth Circuit ruled that the standards of the Michigan law had been preempted by the subsequent federal legislation.

The Court of Appeals did state that "the State of Michigan may continue to enforce the Michigan Law as to meat food products prepared in Michigan solely for distribution in the State as long as its law and its enforcement imposes requirements at least equal to those imposed under Subchapters I and IV of the Federal Act." 468 F.2d at 85.

The legislation which is the subject of the present lawsuit is an attempt by the state to harmonize its legitimate goals of consumer protection with the constraints placed on it by application of the pre-emption doctrine in the *Armour* decision. Recognizing that it may not establish standards respecting ingredients, packaging or labeling and apply them to manufacturers—even in a fashion which furthers the purposes of the Congressional legislation— the State of Michigan has pursued the alternative of simply providing consumers with salient product information. At issue in this suit is whether this activity, too, is preempted or otherwise unlawful under the federal Constitution.

The complaint contains two counts. Count I alleges that Section 4a of the Michigan Comminuted Meat Law is preempted by the Federal Wholesome Meat Act, and that attempts to enforce it violate the Supremacy Clause of the United States Constitution, Article VI, Clause 2. Count I alleges that Section 4a of the Michigan Comminuted Meat Law unduly burdens interstate commerce in violation of the Commerce Clause of the United States Constitution, Article I, Section 8, Clause 3.

■ Defendants filed a motion to dismiss, asserting inter alia that the Michigan law is not preempted, because the required notices do not constitute labeling, and that the requirements of the Act do not uncon-

stitutionally burden interstate commerce. Plaintiff filed a motion for summary judgment on the Supremacy Clause claim, asserting that their case was so obviously correct on this issue that it was unnecessary to consider the interstate commerce clause question at that time.[3] Accordingly, they did not brief this question. Defendants claimed that the interstate commerce issue could only be decided by a three-judge court, and likewise failed to brief the question. Defendants are incorrect in their contention that a single district judge lacks jurisdiction to decide the issue as posed, because plaintiff is seeking only declaratory and not injunctive relief. The law on this question, while logically questionable,[4] is nonetheless clear. When only declaratory, rather than injunctive, relief is sought, a three-judge court is inappropriate. *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963); *Flemming v. Nestor,* 362 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960).

Because neither party has addressed the interstate commerce issue in their briefs or oral arguments, and because there is no adequate record on which to base a conclusion, cf. *Florida Lime and Avocado Growers v. Paul,* 373 U.S. 132, 154, 80 S.Ct. 568, 4 L.Ed.2d 568 (1963), I will not decide that question today.

### Section 4a of the Michigan Comminuted Meat Law is not Preempted by the Federal Wholesome Meat Act.

Plaintiff has correctly characterized the issue in this case as being whether the notices required by the Michigan Law constitute "labeling" as that term is defined by the Federal Wholesome Meat Act. If so, the Michigan law would run afoul of the provisions of 21 U.S.C. § 678, which states that ". . . labeling . . . requirements in addition to, or different than, those made under this chapter may not be imposed by any State. . . ." Although arguments could be made to the contrary,

---

3. Plaintiff's brief, p. 28 n.10.

4. See Hart & Wechsler, Federal Courts and the Federal System, 2nd Ed., 968–969.

the law in the Sixth Circuit is clear—labeling of meat products is completely preempted by the federal government through the Wholesome Meat Act of 1967.[5] If plaintiff is correct, therefore, in asserting that if the notices constitute labeling, the Michigan law must be declared unconstitutional as violating the Supremacy Clause.

However, after careful analysis of both the federal and state legislation and the relevant cases, I find that the notices required by Michigan's law are *not* labeling within the meaning of 21 U.S.C. § 601(p).[6] I find that the decisions support defendants' position that the informational notices which the state requires grocers and restauranteurs to post do not fall within the ambit of the statutory definition, and that Congress simply had a different object in mind when it regulated "labeling." Further, I find the Michigan legislation to be a legitimate exercise of the state's right to communicate information to its citizen-consumers, which is protected both by the First Amendment and by the last sentence of 21 U.S.C. § 678. This provision states that the preemptive language employed by Congress "shall not preclude any State or Territory or the District of Columbia from making requirements or taking other action, consistent with this chapter, with respect to any other matters regulated under this chapter."

■ Defendants argue that a "label" must be something "that is either required of or provided by the producer of the product in a manner incidental to the sale of that product." The court agrees with the State that "the primary intent of the federal labeling requirements is to regulate what producers say about their products." The labeling definition in the Wholesome Meat Act was adopted verbatim from the Food, Drug and Cosmetic Act, 21 U.S.C. § 321(m). S.Rep. 799, U.S.Code Cong. and Admin.

News, 90th Cong., 1st Sess., Vol. 2, p. 2196 (1967). Both parties agree that while there are no cases interpreting the term "labeling" in the context of the Wholesome Meat Act, the court may look for guidance to cases interpreting the identical language of the earlier statute. Cf. *American Airlines v. North American Airlines,* 351 U.S. 79, 82, 76 S.Ct. 600, 100 L.Ed. 953 (1956). Each party, of course, believes these cases support their respective positions.

The reasons I find that the notices here are not "labeling," and thus not preempted, are explained in detail below. To summarize briefly, I find that the language of the cases under the Food and Drug Act support the defendants' position, and together with language from cases interpreting other provisions of the Federal Wholesome Meat Act, unmistakably evinces a Congressional intent quite different from that suggested by plaintiff. The literal terms of the statutory definition do not compel that the informational notices at issue here be construed as labeling, and when viewed in the light of Congressional intent and legislative history, it is clear that they should not be. Finally, there is a strong argument that the notices at issue in this case are protected by the First Amendment, so that any restriction on the state's right to inform consumers through the mechanism it has chosen might be open to constitutional challenge.

The inquiry into the meaning of the term "labeling" should not be confused with the analysis of preemption, and it may be useful to note this distinction at the outset. If the informational posting required by the Michigan statute is "labeling," it is preempted; if not, it is not. Once it is determined (as the Sixth Circuit has) that Congress "unmistakably ordained" that the areas of labeling and ingredient standards are preempted by federal legislation, the question of Congressional intent in passing the legis-

---

5. "By the second preemption test of *Florida Avocado Growers, Inc. v. Paul* [373 U.S. 132, 142, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963)], the Michigan labeling requirements are preempted. Indeed, even under the first preemption test the labeling requirements are preempted; and the State of Michigan so concedes." 468 F.2d at 85.

6. "The term 'labeling' means all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article."

lation becomes largely irrelevant. That is, regardless of whether the Michigan legislation is consistent with, and in furtherance of, Congressional goals, it is preempted if it is "in addition to or different than" federal provisions. The scope of the inquiry is quite limited. On the other hand, in construing the definition of labeling itself, it is entirely appropriate to examine the Congressional intent and interpret the statutory language in light of the "evils sought to be remedied" by the legislation. The two inquiries are largely unrelated except insofar as a finding that the notices in question constitute "labeling" is a sine qua non for a finding of preemption.

■ To determine the meaning of the term "labeling" as used in the statute, the best place to begin is obviously the language of the statute itself and the definition utilized by Congress. If the statutory language were unambiguous, there would be no need to go further. "Legislative language is generally most faithfully construed when it is held to mean simply what it says, read with common sense." *United States v. Vitamin Industries,* 130 F.Supp. 755, 766 (D.Neb.1955). But of course it is also axiomatic that terms such as this must be construed according to the "subject, the context, (and) the intention" of the authors. Cf. *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 415, 4 L.Ed. 579 (1819).

The Michigan law, as noted earlier, requires that grocers and restauranteurs who sell or serve meats not meeting the state's ingredient requirements post a red-on-yellow notice of prescribed size, stating:

"The following products do not meet Michigan's high meat ingredient standards but do meet the lower federal standards."

The Act requires the message to be posted on a placard "clearly visible to a consumer," and gives restaurants the option of printing it on the menu. Such notices can only be construed as "labeling" if that word is employed as a term of art, since they would not fall within the meaning of the word as commonly used and understood. "Label" ordinarily connotes identifying, descriptive or promotional matter affixed to or physically on the item being "labeled." This common meaning is employed by the first part of the statutory definition, under which the required notices obviously could not be labels. Plaintiff argues, however, that the notices are "labels" under part two of the definition, because they would "accompany" the manufacturers' meat products in stores and restaurants. Thus the crux of this case is: What did Congress mean by "accompanying?"

There is no question that materials "accompanying" a product, such as brochures and point of sale display advertising, can constitute labeling under the Food, Drug and Cosmetic Act. Such a definition appears to be a reasonable response to particular problems of misbranding and deceptive practices by manufacturers, and the underlying rationale should apply equally to similar materials used by meat manufacturers, under the Wholesome Meat Act.

Before discussing the cases which plaintiff urges are directly analogous, it may be worthwhile to briefly review those cases dealing with labeling which plaintiff cites in connection with the preemption argument. As noted above, I find that the preemption issue is entirely resolved by the Sixth Circuit's decision in *Armour,* supra, so that consideration of other cases for this purpose is superfluous. However, to avoid confusion, it may also be useful to point out why these others shed little light on the definitional problem posed in this case. Four cases are discussed which treat the question of labeling, two in the area of tobacco regulation, *Campbell v. Hussey,* 368 U.S. 297, 82 S.Ct. 327, 7 L.Ed.2d 299 (1961), and *Lewis v. Campbell,* 425 F.2d 77 (5th Cir. 1970), aff'd, 401 U.S. 985, 91 S.Ct. 1220, 28 L.Ed.2d 526 (1971), and two decided under the Federal Wholesome Meat Act, *Meat Trade Institute v. McLaughlin,* 37 A.D.2d 456, 326 N.Y.S.2d 683 (1971), and *Rath Packing Co. v. Becker,* 357 F.Supp. 529 (C.D.Cal.1973), aff'd, 530 F.2d 1295 (9th Cir. 1975). All four clearly involved labeling requirements in the traditional sense, and none required an interpretation of the term

"accompanying," which is the central issue in the present case. Accordingly, the Georgia tobacco cases are of no particular interest and merit no further discussion here. In fairness to the plaintiff, the court recognizes that it cited these cases only to support its preemption argument, and not to illustrate "labeling" under the second part of the statutory definition (plaintiff does not argue that the notices come within the first part of the definition).

The two "meat cases" likewise do not illuminate the meaning of "accompanying," but are worth notice because they typify the sort of activity which the FWMA meant to include and preempt as labeling, and because they emphasize by contrast the fact that the notices required by Michigan law are simply a different matter altogether. Unlike the case at bar, both *McLaughlin* and *Rath* involved attempts by a state or local government to regulate the labeling *by manufacturers* of their meat products.

In *McLaughlin,* the City of New York passed an amendment to the City Health Code which stated in pertinent part of § 91.07(b):

> "B) A raw pork product shall be deemed to be misbranded:
>
> (1) If in package form unless it bears a label containing the name and place of business of the packer or distributor, and the following statement clearly and legibly printed thereon: 'The raw pork product contained herein must be thoroughly heated or cooked so that all portions thereof reach a temperature of not less than 140° F. to prevent trichinosis.'" *Meat Trade Institute v. McLaughlin,* 66 Misc.2d 1037, 323 N.Y. S.2d 103, 104 (Spec. Term 1971.)

The appellate court, reversing Special Term, ruled that the federal government had preempted the field of labeling meat products, and further, to the extent that there was room for concurrent enforcement, the state had preempted the area, so that the city was an "interloper." 326 N.Y. S.2d at 684. The printed warnings required by New York were clearly labels within the first part of the FWMA definition.

*Rath,* likewise, deals with package labeling by meat manufacturers. The FWMA allows the states to concurrently enforce certain provisions of the Act, including those regarding misbranding. California enacted a statute pertaining to the accuracy of weight statements on meat package labels. It employed a method of statistical averaging to define misbranding in terms of comparing the label of each package of meat to its contents. While the court noted that the federal government preempted the area of meat labeling, it also observed that 21 U.S.C. § 678 allowed states to exercise concurrent jurisdiction in some matters. There was no dispute in this case that the state of California was attempting to regulate "labeling." The court's holding was that the California statute was *inconsistent* with the federal law, and *therefore* preempted. The court's statement in *Rath* that: "Common sense tells us that mislabeling and misbranding are synonymous terms," 357 F.Supp. at 535 n. 4, highlights the sort of problem Congress was trying to attack through "labeling" regulations, and underscores the error in plaintiff's attempt to apply the term to the Michigan notices.

The cases which plaintiff argues are analogous under the Food, Drug and Cosmetic Act are more germane because they involve construction of the statutory language used to define "labeling," and particularly the term "accompanying." They also uniformly illustrate the fact that what Congress sought to reach with the legislation being examined here was fraudulent or deceptive practices by manufacturers or distributors of regulated products, to the end of protecting consumers.

The plaintiff vigorously urges the court to construe the disputed provisions of the Wholesome Meat Act in the same fashion that other courts have construed the identical terms of the Food, Drug and Cosmetic Act. Plaintiff cites a number of cases interpreting this latter statute, including *Kordel v. United States,* 335 U.S. 345, 69 S.Ct. 106, 93 L.Ed. 52 (1948), and *United States v. Urbeteit,* 335 U.S. 355, 69 S.Ct. 112, 93 L.Ed. 61 (1948). According to plain-

tiff's brief, "these two cases lay out the basis for analyzing the labeling statutes." In *Kordel,* the Supreme Court found that it should construe the definition of labeling to encompass literature mailed under separate cover by the manufacturer, because to rule otherwise would "create an obviously wide loophole" and *"(t)he high purpose of the Act to protect consumers who under present conditions are largely unable to protect themselves in this field would then be easily defeated."* 335 U.S. at 349, 69 S.Ct. at 109 (Emphasis supplied.) In the companion *Urbeteit* case, the Court noted that "(t)he problem is a practical one of consumer protection, not dialectics," 345 U.S. at 358, 69 S.Ct. at 114. In these cases, the United States Supreme Court clearly indicated that the "labeling" provision is to be construed so as to further the Congressional goal of consumer protection.

These cases and the other cited by plaintiff all involve similar incidents of misbranding or fraudulent misrepresentations by manufacturers or others involved in the distribution or sales of a product. That is what Congress sought to reach with the legislation being examined here. One case in particular upon which plaintiff relies is especially instructive as to the history of the statutory definition of labeling. In that case, *United States v. Seven Jugs, Etc. of Dr. Salsbury's Rakos,* 53 F.Supp. 746 (D.Minn.1944), the court examines Congress' use of "accompanying," and explains the context in which Congress acted when it adopted that term as part of the definition of labeling. The court prefaced its examination of the statutory history by stating that in construing the provisions of the Food, Drug and Cosmetic Act,

> "consideration should be given to the purposes of the Act, its history, the specific terminology used therein and the enforcement procedures adopted. . . One of the most important enactments under the Commerce Clause, its purpose of protecting the public health and pocketbook against adulterated and misbranded foods and drugs, has led courts to declare with unanimity that food and drug legislation should be given a liberal construction in order to accomplish its remedial purposes. (Citations omitted.)"

The court in *Rakos* traces the present labeling provisions to the original 1906 Food and Drug Act, which Congress enacted to "regulate what it regarded as illicit articles of commerce." Citing the Supreme Court's opinion in *Hipolite Egg Co. v. United States,* 220 U.S. 45, 57, 31 S.Ct. 364, 55 L.Ed. 364, which explains the basis for this seminal legislation, the court notes:

> "'We are dealing, it must be remembered, with illicit articles—articles which the law seeks to keep out of commerce because they are debased by adulteration, and which punishes them (if we may so express ourselves) and the shipper of them.' 220 U.S. at page 57, 31 S.Ct. at page 367. . . . (I)n the case of misbranding (this illicit quality) was supplied by the presence of a false label on the article. . . .
>
> "Inasmuch as Congress was dealing with what it regarded as illicit articles of commerce, it is not surprising that under the 1906 Act, the concept of misbranding was limited to the label or brand appearing upon the article or package. . . . 'The label is the means of vindication or the basis of punishment in determining the character of the interstate shipment dealt with by Congress. . . . "
>
> "It soon became apparent, however, that this concept of misbranding was too narrow. Thus a manufacturer could make false claims on a circular enclosed in the package containing the article without misbranding it under the phraseology of Section 8. . . . Congress in 1912 endeavored to correct this deficiency by passing the Sherley Amendment which defined as misbranded any article whose 'package' or label shall bear or contain any statement, design, or device regarding the curative or therapeutic effect of such article or any of the ingredients or substances contained therein, which is false and fraudulent'. . . . Just as the label, under the 1906 Act, conferred upon the article its illicit character in commerce, so now the circular

under the 1912 amendment provided this status. . . .

"So prior to 1938, the law protected the public only where false claims were made on the label or package or in a circular within the package. Accordingly, to avoid the jurisdiction of the Food and Drug Administration, a patent medicine manufacturer needed only to separate physically the printed matter bearing the false claims from the article itself. This and other deficiencies in the old Act resulted in its complete overhauling by Congress and culminated in the enactment in 1938 of the present Act. *The avowed objective of the new Act was to strengthen the protection afforded the public by eliminating the loopholes and expanding consumer protection.* Cong. Rec. 73rd Cong., 2nd session, Vol. 78, Part 5, pp. 4567–4573. Many new provisions were added and old ones enlarged. The concept of misbranding was expanded to include any drug whose 'labeling' is false or misleading. 'Labeling' comprehends labels, container wrappers, and all written, printed or graphic matter which accompanies any article of food or drug.

. . .

"*Realizing that Congress was attempting to expand the protection given consumers in redefining the concept of misbranding, it is evident that the word 'accompany' should be given an interpretation which accords with the Congressional purpose.*" 53 F.Supp. 752–53. [Emphasis supplied.]

■ This review of the history which led Congress to employ the term "accompany" shows beyond a doubt that Congress was seeking to protect consumers and to curb misleading information provided by those involved in manufacturing or selling regulated products. Nothing in these cases indicates the slightest intent to prohibit a state from communicating information to its citizen-consumers in order to assist them in making informed purchasing decisions. In fact, the clear thrust of the legislation is in the opposite direction.

■ The court agrees with plaintiff that the history behind adoption of the Food, Drug and Cosmetic Act's definition of labeling, and cases construing that language, are appropriate precedents upon which to base a decision in this case. Accordingly, I find that the definition of labeling is to be construed in a manner which is consistent with the Congressional goal of protecting consumers, and that the notices required by Michigan law are not "labels" within the meaning of the statute.

While the parties have stated that there are no cases interpreting the term "labeling" under the Federal Wholesome Meat Act, there are nonetheless cases dealing with other portions of this statute which show that the Congressional purpose in passing this Act, like the Food and Drug Act, was to protect consumers and regulate deceptive and harmful practices by manufacturers and sellers.

The Congressional Statement of Findings, included in the statute itself, shows both the intent to benefit consumers and the context in which Congress sought to regulate labeling. It states in part:

"  .   .   .   It is essential in the public interest that the health and welfare of consumers be protected by assuring that meat and meat food products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged. *Unwholesome, adulterated, or misbranded meat or meat food products impair the effective regulation of meat   .   .   .   are injurious to the public welfare, destroy markets for wholesome, not adulterated, and properly labeled and packaged meat and meat food products, and result in   .   .   .   injury to consumers. The unwholesome, adulterated, mislabeled, or deceptively packaged articles can be sold at lower prices and compete unfairly with the wholesome, not adulterated, and properly labeled and packaged articles, to the detriment of consumers and the public generally.   .   .   .*" 21 U.S.C. § 602.

Other courts have observed that the policy of the Wholesome Meat Act "*is above all*

*to protect the health and welfare of con-sumers,"* G. A. Portello & Co. v. Butz, 345 F.Supp. 1204, 1208 (D.C.1972), and that its "primary purpose . . . is to benefit the consumer and to enable him to have correct understanding of and confidence in meat products purchased." *Federation of Homemakers v. Hardin,* 328 F.Supp. 181 (D.C.D.C.1971).

In light of the strong and legitimate state interest in consumer education and protection, the underlying purposes of the Federal Wholesome Meat Act, and the presumption of constitutionality of state statutes, cf. *O'Gorman and Young, Inc. v. Hartford Fire Insurance Co.,* 282 U.S. 251, 257–58, 51 S.Ct. 130, 75 L.Ed. 324 (1931), I can find no basis for straining the statutory language to encompass the factual situation presented by the Michigan notice requirement. The term "labeling" has a meaning derived from the purposes of the legislation and inseparable from the history which gave rise to its definition. Plaintiff's attempt to redefine the word "label" in order to make it fit the facts of this case is not only unsupported by, but is contrary to, the Congressional intent and cannot be sustained by this court. Plaintiff's contentions are perversions of Congressional intent and of the letter and spirit of the law.

Whether or not Congress could have prohibited the notices required here is problematical and need not be decided here, but as discussed below, it is likely that such an attempt to cut off the flow of information between the State and its citizen-consumers might contravene the First Amendment rights of each. As it is, since the notices do not constitute labeling, and no claim has been made that they otherwise come within the provisions of the FWMA, they are permissible under the terms of the last sentence of 21 U.S.C. § 678:

"This chapter shall not preclude any State or Territory or the District of Columbia from making requirement or taking other action, consistent with this chapter, with respect to any other matters regulated under this chapter."

In oral argument, plaintiff conceded that the state has a right to inform consumers and argued that it could do so in any number of ways, so long as they do not constitute labeling. According to plaintiff's attorney,

"there are many other devices the state could employ to inform consumers, if it so desired. (For example,) any manner of flyers, leaflets which do not accompany the product. I am sure the state officials would have no lack of ingenuity in coming up with other means of informing the public, through advertising and the like." [Tr. 43.]

I note that it is common practice for many supermarkets to advertise in newspapers and then display copies of the newspaper advertisement through the store, often in close proximity to the products advertised. Would plaintiff argue that an advertisement, which it has suggested would be an appropriate way for the state to inform customers about the differences between Michigan and federal meat standards, would be acceptable (constitutional) in a newspaper, but prohibited (unconstitutional) if the store wanted to tear it from the paper and post it in proximity to the meat counter? The obvious weakness of such a position only emphasizes the inherent difficulty in trying to distort the statutory definition to fit purposes other than those originally intended. But the example also raises another important area of concern—whether attempts to limit the state's communications with its citizen-consumers may violate the First Amendment.

The First Amendment is involved here in two different but related ways. First, we can analyze this as a right of consumers to know relevant information, or, we could view this from the perspective of the state alone, in terms of a right of free speech which the state as sovereign may exercise. Each of these is a relatively undeveloped, but meritorious concept.

*First Amendment Rights of Consumers.*

The right of consumers to receive relevant product information has only recently

been explicitly enunciated by the Supreme Court as a protectible interest encompassed by the First Amendment. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). The right to know or to hear or receive information, is in theory one of the principal underpinnings of the First Amendment, but it has usually remained in the shadows of legal battles over free speech and press. Most of the major freedom of expression cases have involved private individuals or corporate media asserting their own right, as guaranteed by the First Amendment, to communicate to whomever they pleased. The notion that their intended or prospective audience had a right to hear what they wanted to say was usually a makeweight argument. In fact, it is an argument which the established news media have been somewhat hesitant about aggressively asserting, since if logically extended, it might have implications requiring some affirmative duties on their part. See *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974); *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973). Nonetheless, as the Court pointed out in the *Virginia State Board of Pharmacy* opinion, there have been numerous decisions over the past thirty years recognizing First Amendment protection of the right to know, in a variety of contexts. See *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Kleindienst v. Mandel,* 408 U.S. 753, 763, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 386, 390, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *Stanley v. Georgia,* 394 U.S. 557, 564, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); *Lamont v. Postmaster General,* 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965); *Thomas v. Collins,* 323 U.S. 516, 534, 65 S.Ct. 516, 89 L.Ed. 430 (1945); *Martin v. Struthers,* 319 U.S. 141, 143, 63 S.Ct. 862, 87 L.Ed. 1313 (1943). See also, the recent decision of the Sixth Circuit in *Minarcini v. Strongsville City School District,* 541 F.2d 577, 583 (Decided August 30, 1976).

In *Stanley,* supra, Justice Marshall noted: "It is now well established that the Constitution protects the right to receive information and ideas. . . . This right to receive information . . . is fundamental to our free society." 394 U.S. at 564, 89 S.Ct. at 1247. The Court in the *Virginia Board of Pharmacy* case makes clear that this notion extends to the commercial marketplace, as well as the marketplace of ideas.

"As to the particular consumer's interest in the free flow of commercial information, that interest may be as keen, if not keener by far, than his interest in the day's most urgent political debate. Appellee's case in this respect is a convincing one. *Those whom the suppression of prescription drug price information hits the hardest are the poor, the sick, and particularly the aged.* . . .

"Generalizing, society also may have a strong interest in the free flow of commercial information. . . . So long as we preserve a predominantly free enterprise economy, the allocation of resources in large measure will be made through numerous private economic decisions. *It is a matter of public interest that those decisions, in the aggregate, be intelligent and well informed. To this end, the free flow of commercial information is indispensable.*" 425 U.S. at 763, 764, 96 S.Ct. at 1826–1827 [Emphasis supplied.]

The Court also notes that the justification for keeping the information at issue from the citizens of the state *"rests in large measure on the advantages of their being kept in ignorance."* Id. at 769, 96 S.Ct. at 1829.

I have found in this case that Congress did not intend to bring the informational notices required by Michigan law within the definition of "labeling" found in the Federal Wholesome Meat Act. If it had, we would be faced with a serious question of whether such a statutory provision unconstitutionally violates the First Amendment rights of consumers and the state. The Court held in the *Virginia Board of Phar-*

*macy* case that the government is "free to require whatever professional standards it wishes . . . .. But it may not do so by keeping the public in ignorance of the entirely lawful terms that competing pharmacists are offering." Id.

Michigan's goal of placing pertinent product information before its citizen-consumers cannot be thwarted by categorizing the message as "labeling" if it otherwise deserves protection of the First Amendment.

> "The Court has stated that 'a State cannot foreclose the exercise of constitutional rights by mere labels.' *NAACP v. Button,* 371 U.S. [415], at 429, 83 S.Ct. [328], at 336 [9 L.Ed.2d 405]. Regardless of the particular label asserted by the (government) . . . *a court may not escape the task of assessing the First Amendment interest at stake and weighing it against the public interest allegedly served by the regulation."* *Bigelow v. Virginia,* 421 U.S. 809, 826, 95 S.Ct. 2222, 2235, 44 L.Ed.2d 600 (1975).

The likelihood that such an attempt to preclude the state from disseminating important product information to its citizen-consumers would be unconstitutional is additional strong evidence that the definition of labeling in 21 U.S.C. § 601(p) should not be construed to encompass the notices at issue here. Legislation should be construed so as to avoid raising even a serious question about its constitutionality. Cf. *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932).

The *Virginia Board of Pharmacy* opinion also meets plaintiff's argument that the state should employ some alternative means of informing consumers rather than using what the state legislature has determined to be the most directly efficient and desirable route. The majority notes the dissenters' contention that there is no right to receive information which another seeks to disseminate, at least when the information could be obtained another way, and rejects it:

> "Our prior decisions, cited above, are said to have been limited to situations in which the information sought to be received 'would not be otherwise available'; emphasis is also placed on the appellees' great need for the information, which need, assertedly, should cause them to take advantage of the alternative of digging it up themselves. We are aware of no general principle that freedom of speech may be abridged when the speaker's listeners could come by his message by some other means, such as seeking him out and asking him what it is. Nor have we recognized any such limitation on the independent right of the listener to receive the information sought to be communicated." 425 U.S. at 757 n. 15, 96 S.Ct. at 1823, n. 15.

Plaintiff's counsel argued at the hearing that he was "sure that state officials would have no lack of ingenuity in coming up with other means of informing the public, through advertising and the like," rather than the notices now required. However, making a very similar observation about the ease with which a pharmacist could circumvent the proscriptions of the Virginia law, the Court stated: "We see little point in requiring him to do so, and little difference if he does not." Id., 764, 96 S.Ct. at 1827. Similarly, the Court noted that there is no requirement that communicators resort to generalities in order to avail themselves of First Amendment protection. Id., 762, 96 S.Ct. at 1826.

Michigan adopted Section 4a in order to inform its citizen-consumers and enable them to make intelligent purchasing decisions. If this is what plaintiff means in its brief when it cynically accuses the state of "playing on consumer preferences," then the state may well be guilty—to its credit, and the benefit of its consumers. Consumers often knowingly buy items which are not the least expensive or most nutritious. They base their purchasing decisions on many factors, *but one of these should not be ignorance imposed by government and the product manufacturers.* Michigan's consumers have a right, protected by the First Amendment, to receive this relevant product information which the state seeks to disseminate to them.

*The "Free Speech" Rights of the State.*

The question of whether the state as a sovereign entity has a right, akin to freedom of speech, which it may exercise on behalf of its citizen-consumers, is more difficult conceptually, but one which I believe must be answered in the affirmative. In their motion to dismiss, the defendants in this case argue that the notices they require are not labeling, and state: "The State of Michigan is simply exercising its sovereign freedom of speech by warning its citizens of the inherent inferiority of the federal wholesome meat standards." The idea that the state possesses a right to communicate is not often articulated. References to such a right in the case law are infrequent and oblique, but can be found. For example, the Supreme Court in *Bigelow,* supra, stated that a state *"may seek to disseminate information so as to enable its citizens to make better informed decisions"* about matters affecting their health and welfare. 421 U.S. at 824, 95 S.Ct. at 2234.

The source of a state's right of free speech may be threefold—sovereignty, and related to this, reserved powers under the Tenth Amendment, and finally, the First Amendment. The Bill of Rights, of course, was enacted at the insistence of the states as a guarantee of restraints on the federal government. While normally we think of the Bill of Rights as protection for individuals, there is no reason that at least some of these rights should not also apply to governmental units as well. For example, the federal government cannot take state property without due process.

The Fourteenth Amendment, by incorporating the First Amendment, provides a vehicle for citizens to assert free speech rights against the state, but this does not mean that the state cannot also exercise rights of its own so long as they do not conflict with those of the people. When a state operates a public broadcasting facility, for example, it is acting in an area where freedom of expression is traditionally necessary and protected by the First Amendment. It is beyond the scope of this opinion to explore all the ramifications of this, or to define areas in which the free speech rights of public broadcasters may differ from those of commercial broadcasters. This example is offered simply as one illustration of how states may exercise "free speech" rights. The opportunity for a state to communicate information to benefit the health and welfare of its citizen-consumers is a fundamental justification for the existence of such a right.

Assuming that the state has such a right, however, it is not clear whether it should be applied in a situation such as this, where the state is not communicating directly, but is instead requiring grocers and restauranteurs to provide the information. I note this issue only in passing, and need not reach it here, since I have found that the notices are not precluded by the federal legislation, and since, in any event, the First Amendment rights of the consumers under the *Virginia Board of Pharmacy* decision would obviate inquiry into the rights of the state.

Because I have found that the notices required by the state in Section 4a of the Michigan Comminuted Meat Act are not preempted, and for the other reasons discussed in the foregoing opinion, I hereby deny the plaintiff's motion for partial summary judgment.

IT IS SO ORDERED.