[No. D053325. Fourth Dist., Div. One. Dec. 22, 2009.]

AMERICAN MEAT INSTITUTE et al., Plaintiffs and Appellants, v. WHITNEY R. LEEMAN, Defendant and Appellant.

COUNSEL

Morrison & Foerster, Michele B. Corash, Maria Chedid, William F. Tarantino and Joanna E. Herman for Plaintiffs and Appellants.

Hirst & Chanler, Clifford A. Chanler and David Lavine for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dennis A. Ragen and Claudia Polsky, Deputy Attorneys General, as Amicus Curiae on behalf of Defendant and Appellant.

OPINION

IRION, J.—American Meat Institute and National Meat Association (the Trade Associations) filed suit against Whitney R. Leeman seeking a declaration that the consumer warnings required by the California Safe Drinking Water and Toxic Enforcement Act of 1986, Health and Safety Code section 25249 et seq., commonly known as Proposition 65, are preempted by the Federal Meat Inspection Act (21 U.S.C. § 601 et seq. (the FMIA)).

In this appeal, Leeman challenges two rulings. First, she challenges the trial court's decision overruling her demurrer, in which she contended (a) that the complaint failed to plead an actual controversy between the parties to support declaratory relief; and (b) that, for several reasons, it was not necessary or proper for the court to exercise its power to grant declaratory relief. Second, Leeman challenges the trial court's decision granting summary judgment in favor of the Trade Associations, in which it concluded that the FMIA preempted Proposition 65 point of sale warning requirements with respect to meat.

We conclude that the trial court properly overruled the demurrer. Further, we conclude that the FMIA expressly preempts point of sale warning requirements imposed by Proposition 65 with respect to meat, and on that basis we affirm the trial court's ruling on the motion for summary judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

*The Applicable Legal Framework*

1. *Proposition 65*

Proposition 65, which was passed as a ballot initiative in 1986, requires the state to develop and maintain a list of chemicals "known to the state to cause cancer or reproductive toxicity." (Health & Saf. Code, § 25249.8, subd. (a).)[1] It also requires that businesses provide warnings before consumers are exposed to such chemicals. Specifically, Proposition 65 states that "[n]o person in the course of doing business shall knowingly and intentionally expose any individual to a chemical known to the state to cause cancer or reproductive toxicity without first giving clear and reasonable warning to such individual . . . ," except as otherwise provided by the statute. (Health & Saf. Code, § 25249.6.)[2]

The warning required by Proposition 65 "may be provided by general methods such as labels on consumer products . . . , posting of notices, placing notices in public news media, and the like, provided that the warning accomplished is clear and reasonable." (Health & Saf. Code, § 25249.11, subd. (f).) According to the regulations implementing Proposition 65, warnings for consumer products may take the form of "[a] warning that appears on a product's label or other labeling"; "[i]dentification of the product at the retail outlet in a manner which provides a warning" such as "shelf labeling, signs, menus, or a combination thereof"; or "[a] system of signs, public advertising identifying the system and toll-free information services, or any

---

[1] Among the chemicals identified by the state as carcinogens pursuant to Proposition 65 are polychlorinated dibenzo-p-dioxins (dioxins) and polychlorinated biphenyls (PCB's). (Cal. Code Regs., tit. 27, § 27001, subd. (b).) PCB's are also identified as reproductive toxins. (*Id.*, subd. (c).)

[2] As relevant here, one statutory exception to the Proposition 65 warning requirement arises when "federal law governs warning in a manner that preempts state authority." (Health & Saf. Code, § 25249.10, subd. (a).) Proposition 65's warning requirements also do not apply to an exposure (1) that occurs less than 12 months after the chemical at issue has been listed as a carcinogen or reproductive toxin; or (2) for which it can be shown that the exposure poses no significant risk, assuming lifetime exposure. (Health & Saf. Code, § 25249.10, subds. (b), (c).)

other system that provides clear and reasonable warnings." (Cal. Code Regs., tit. 27, § 25603.1, subds. (a), (b), (d); see also *People ex rel. Lungren v. Cotter & Co.* (1997) 53 Cal.App.4th 1373, 1378 [62 Cal.Rptr.2d 368] ["a merchant can comply with Proposition 65 by posting a sign stating the products are known to the state to cause cancer and/or are reproductively toxic"].)[3]

A private citizen may bring an action to enforce Proposition 65 provided that (1) at least 60 days before filing a lawsuit the citizen gives notice to the alleged violator, the Attorney General, district attorneys and city attorneys in the jurisdiction where the violation occurred; and (2) no public official has already commenced prosecution of the same violation. (Health & Saf. Code, § 25249.7, subd. (d)(1).)

If found in an enforcement action to have violated the requirements of Proposition 65, a violator "shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) per day for each violation in addition to any other penalty established by law." (Health & Saf. Code, § 25249.7, subd. (b)(1).)

### 2. *The FMIA*

The FMIA regulates meat and food products made from meat.[4] (21 U.S.C. § 602.) As Congress explained, the FMIA was enacted because "[i]t is essential in the public interest that the health and welfare of consumers be protected by assuring that meat and meat food products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged." (21 U.S.C. § 602.)

The FMIA requires governmental inspectors under the United States Department of Agriculture (USDA) to perform pre- and postslaughter inspection of the animals used for meat. (21 U.S.C. §§ 603–605.) Thereafter, the

---

[3] The regulations implementing Proposition 65 provide warning language which (according to Cal. Code Regs., tit. 27, § 25603, subd. (a)) is deemed to be clear and reasonable:

"The warning message must include the following language:

"1. For consumer products that contain a chemical known to the state to cause cancer:

" 'WARNING: This product contains a chemical known to the State of California to cause cancer.'

"2. For consumer products that contain a chemical known to the state to cause reproductive toxicity:

" 'WARNING: This product contains a chemical known to the State of California to cause birth defects or other reproductive harm.' " (Cal. Code Regs., tit. 27, § 25603.2, subd. (a).)

[4] Specifically, the FMIA regulates meat and meat food products made from the meat of cattle, sheep, swine, goats, horses, mules or other equines. (21 U.S.C. § 601(j).) For the sake of simplicity, we will refer collectively to meat and meat food products as "meat." A separate statute—the Poultry Products Inspection Act—regulates poultry products. (21 U.S.C. § 451 et seq.)

meat is to be marked either " 'inspected and passed' " or " 'inspected and condemned,' " based on whether the meat is found to be adulterated or unadulterated. (21 U.S.C. § 606.) As relevant here, meat is adulterated if, among other things, "it bears or contains any poisonous or deleterious substance which may render it injurious to health; but in case the substance is not an added substance, such article shall not be considered adulterated under this clause if the quantity of such substance in or on such article does not ordinarily render it injurious to health." (21 U.S.C. § 601(m)(1).)

The FMIA prohibits any person from offering meat for sale if it is "adulterated or misbranded at the time of such sale [or] offer for sale." (21 U.S.C. § 610(c).)[5] Meat is misbranded if, among other things, "its labeling is false or misleading in any particular." (21 U.S.C. § 601(n)(1).) "The term 'labeling' means all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." (21 U.S.C. § 601(p).)[6]

The federal regulations that implement the FMIA (9 C.F.R. § 300 et seq. (2009)) describe in great detail the rules for the labeling of meat. (9 C.F.R. §§ 317.1–317.400 (2009).) The regulations provide, among other things, that with the exception of certain generically approved labeling, "[n]o final labeling shall be used on any product unless the sketch labeling of such final labeling has been submitted for approval . . ." to the applicable federal regulatory agency. (9 C.F.R. § 317.4(a) (2009).) Further, according to the regulations, "[n]o product or any of its wrappers, packaging, or other containers shall bear any false or misleading marking, label, or other labeling and no statement, word, picture, design, or device which conveys any false

---

[5] Leeman contends that "retail outlets are not 'official establishments' subject to inspection" under the FMIA, and thus "the FMIA would not be applicable to the . . . retail outlets named in [Leeman's] Notice, and no preemption . . . could prevent state regulation from operating at the retail outlets." Leeman misreads the FMIA, which, as relevant here, plainly includes provisions regulating the labeling for meat when it is sold at retail outlets. Among other things, the FMIA states that "[n]o article [subject to subchapter I of the FMIA] shall be sold or offered for sale by any person, firm, or corporation, in commerce, under any name or other marking or labeling which is false or misleading . . . , but established trade names and other marking and labeling and containers which are not false or misleading and which are approved by the Secretary [of Agriculture] are permitted." (21 U.S.C. § 607(d).) "Congress intended to continue the protection provided under the [FMIA] to the point at which the consumer receives the meat and meat food products subject to the Act, i.e., at the retail food store level." (*Rath Packing Co. v. Becker* (9th Cir. 1975) 530 F.2d 1295, 1315 (*Rath*), affd. *sub nom. Jones v. Rath Packing Co.* (1977) 430 U.S. 519 [51 L.Ed.2d 604, 97 S.Ct. 1305].)

[6] In contrast, "[t]he term 'label' means a display of written, printed, or graphic matter upon the immediate container (not including package liners) of any article." (21 U.S.C. § 601(*o*).)

impression or gives any false indication of origin or quality or is otherwise false or misleading shall appear in any marking or other labeling."[7] (9 C.F.R. § 317.8(a) (2009).)

The FMIA contains a preemption provision, which provides in relevant part: "Marking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under this chapter may not be imposed by any State or Territory or the District of Columbia with respect to articles prepared at any establishment under inspection in accordance with the requirements under subchapter I of this chapter,[8] but any State or Territory or the District of Columbia may, consistent with the requirements under this chapter, exercise concurrent jurisdiction with the Secretary over articles required to be inspected under said subchapter I, for the purpose of preventing the distribution for human food purposes of any such articles which are adulterated or misbranded and are outside of such an establishment, or, in the case of imported articles which are not at such an establishment, after their entry into the United States." (21 U.S.C. § 678.)[9]

### 3. The Trade Associations' Declaratory Relief Lawsuit

The Trade Associations represent packers and processors of meat. In November 2004, Leeman sent notices to eight meat processors and retailers, including six members of the Trade Associations, as well as to the Attorney General, the district attorneys for each of California's 58 counties and certain city attorneys (the Notices). The Notices were titled "60-day Notice of Violation," and specified that they were sent in compliance with that portion of Proposition 65 requiring a 60-day notice before the filing of a citizen suit. (Health & Saf. Code, § 25249.7, subd. (d).)[10] In the Notices, Leeman

---

[7] The definition of "labeling" in the regulations is the same as in the FMIA. (9 C.F.R. § 301.2 (2009).)

[8] Subchapter I of the FMIA covers inspection and labeling requirements for meat. (21 U.S.C. §§ 601–625.)

[9] Title 21 United States Code section 678 was enacted as part of the Wholesome Meat Act (Pub.L. No. 90-201, § 408 (Dec. 15, 1967) 81 Stat. 600), which amended the FMIA. (*Rath, supra,* 530 F.2d at p. 1313.) "Congressional debates are devoid of any discussion of Section 408 of the [Wholesome Meat] Act (21 U.S.C. § 678)." (*Armour and Company v. Ball* (6th Cir. 1972) 468 F.2d 76, 84.)

[10] Health and Safety Code section 25249.7 provides in relevant part: "Actions pursuant to this section may be brought by any person in the public interest if both of the following requirements are met: [¶] (1) The private action is commenced more than 60 days from the date that the person has given notice of an alleged violation . . . that is the subject of the private action to the Attorney General and the district attorney, city attorney, or prosecutor in whose jurisdiction the violation is alleged to have occurred, and to the alleged violator. If the notice alleges a violation of Section 25249.6, the notice of the alleged violation shall include a certificate of merit executed by the attorney for the noticing party, or by the noticing party, if the noticing party is not represented by an attorney. . . . [¶] (2) Neither the Attorney General,

identified dioxins as carcinogens and PCB's as both carcinogens and reproductive toxins, and she stated that the companies at issue were selling either ground beef or beef liver products containing PCB's and dioxins without supplying the warnings required by Proposition 65. Accompanying each of the Notices was a certificate of merit signed by Leeman's attorney, as required by Health and Safety Code section 25249.7, subdivision (d), which stated, among other things, that "there is a reasonable and meritorious case for the private action."

After their members received the Notices, the Trade Associations negotiated with Leeman on behalf of their members. Leeman agreed that she would wait several months longer than the required 60 days before filing a citizen suit. The delay would allow more time to explore a potential resolution and give the Attorney General's Office time to more fully assess the matter.

On the day that the extended waiting period expired, the Trade Associations filed this declaratory relief action against Leeman (the complaint), seeking declaratory relief on behalf of all of the Trade Associations' members that, "as applied to meat and meat products, the warning requirement of [Proposition 65] is preempted by the [FMIA] and its implementing regulations."[11] The complaint contended that the FMIA both impliedly and expressly preempted Proposition 65 with respect to meat labeling requirements.[12]

Leeman filed a demurrer to the complaint. In the demurrer, Leeman raised two contentions that are relevant here. First, Leeman argued that the facts pled in the complaint did not establish an actual controversy between the parties sufficient to support a claim for declaratory relief because it was not

---

any district attorney, any city attorney, nor any prosecutor has commenced and is diligently prosecuting an action against the violation." (Health & Saf. Code, § 25249.7, subd. (d).)

[11] The Trade Associations apparently brought this action on the basis of associational standing, under which an association may bring a lawsuit as the representative of its members when the following requirements are met: " '(a) [the association's] members would otherwise have standing to sue in their own right; (b) the interests [the association] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.' " (*Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior Court* (2009) 46 Cal.4th 993, 1004 [95 Cal.Rptr.3d 605, 209 P.3d 937].) "If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." (*Warth v. Seldin* (1975) 422 U.S. 490, 515 [45 L.Ed.2d 343, 95 S.Ct. 2197].) The issue of associational standing is not before us in this appeal.

[12] In the early stages of the litigation, Leeman filed a special motion to strike under the anti-SLAPP (strategic lawsuit against public participation) statute, Code of Civil Procedure section 425.16. The trial court denied the anti-SLAPP motion, and Leeman appealed. In August 2006, we issued an opinion affirming the trial court's decision. (*American Meat Institute v. Leeman* (Aug. 31, 2006, D047115) [nonpub. opn.] (*Leeman I*).)

certain, based on Leeman's service of the Notices alone, that she intended to bring a citizen's enforcement action against the Trade Associations' members. Second, Leeman argued that it was not "necessary" or "proper" (Code Civ. Proc., § 1061) for the trial court to grant declaratory relief on the preemption issue because (1) the same issue could be raised and decided as an affirmative defense in any enforcement action eventually filed by Leeman; and (2) "the purpose of the declaratory relief action—to expeditiously settle rights and obligations—would be frustrated as to potential plaintiffs beyond [Leeman]" because "[t]he Attorney General as well as all other citizen enforcers would not be bound by a judgment against [Leeman], and would still be free to bring a similar suit under Proposition 65."

The trial court overruled the demurrer. The minute order ruling on the demurrer stated that "sufficient facts have been pled to establish an actual controversy." The trial court did not specifically address Leeman's contention that it should exercise its discretion to dismiss the complaint on the ground that declaratory relief was not necessary or proper.

The Trade Associations filed a motion for summary judgment, in which they argued that the FMIA preempted the warning requirements of Proposition 65 with respect to the sale of meat. The trial court granted the motion, ruling that the doctrine of implied preemption applied, but that the doctrine of express preemption did not.

Leeman filed a notice of appeal from the judgment. The Trade Associations filed a protective cross-appeal, which challenges the trial court's ruling that the doctrine of express preemption does not apply.

II

DISCUSSION

A. *Leeman's Challenge to the Trial Court's Decision Overruling Her Demurrer*

We first examine Leeman's contention that the trial court erred in overruling her demurrer. Leeman argues (1) the complaint did not plead an actual controversy sufficient to support a complaint for declaratory relief; and (2) the trial court abused its discretion in deciding to entertain the declaratory relief action because such relief was not necessary and proper in that (a) the same issue could be decided as an affirmative defense in an eventual enforcement action brought against the Trade Associations' members, and (b) the ruling on the preemption issue presented in this action would not have a binding effect in an enforcement action brought by a party other than Leeman.

### 1. Standard of Review

"Whether a claim presents an 'actual controversy' within the meaning of Code of Civil Procedure section 1060 is a question of law that we review de novo." (*Environmental Defense Project of Sierra County v. County of Sierra* (2008) 158 Cal.App.4th 877, 885 [70 Cal.Rptr.3d 474].) When an actual controversy does exist, Code of Civil Procedure section 1061 gives the trial court discretion to determine whether it is "necessary" and "proper" to exercise the power to provide declaratory relief. (Code Civ. Proc., § 1061.) A trial court's decision to exercise that power is reviewed under an abuse of discretion standard of review. (*Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 647 [88 Cal.Rptr.3d 859, 200 P.3d 295] (*Meyer*).)

### 2. Actual Controversy Requirement

In analyzing Leeman's challenge to the trial court's ruling sustaining the demurrer, we first consider whether the complaint described an actual controversy sufficient to support a claim for declaratory relief.

■ Code of Civil Procedure section 1060 provides that declaratory relief is available only in the context of an actual controversy. "Any person . . . who desires a declaration of his or her rights or duties with respect to another . . . may, *in cases of actual controversy* relating to the legal rights and duties of the respective parties, bring an original action or cross-complaint in the superior court for a declaration of his or her rights and duties in the premises, including a determination of any question of construction or validity arising under the instrument or contract. . . . The declaration may be had before there has been any breach of the obligation in respect to which said declaration is sought." (Code Civ. Proc., § 1060, italics added.) "The 'actual controversy' referred to in [Code of Civil Procedure section 1060] is one which admits of definitive and conclusive relief by judgment within the field of judicial administration, as distinguished from an advisory opinion upon a particular or hypothetical state of facts. The judgment must decree, not suggest, what the parties may or may not do." (*Selby Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110, 117 [109 Cal.Rptr. 799, 514 P.2d 111].) In a complaint seeking declaratory relief, " 'an actual, present controversy must be pleaded specifically' and 'the facts of the respective claims concerning the [underlying] subject must be given.' " (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 80 [124 Cal.Rptr.2d 519, 52 P.3d 695].)[13]

One purpose of declaratory relief is " ' "to liquidate doubts with respect to uncertainties or controversies which might otherwise result in subsequent

---

[13] In ruling on the demurrer, in addition to the allegations of the complaint, the trial court had before it the Notices, which were presented in a request for judicial notice.

litigation." ' " (*Meyer, supra,* 45 Cal.4th at p. 647.) " ' "One test of the right to institute proceedings for declaratory judgment is the necessity of present adjudication as a guide for plaintiff's future conduct in order to preserve his legal rights." ' " (*Ibid.*)

■    Here, we conclude that the Notices gave rise to an actual controversy between Leeman and the Trade Associations' members.[14] Under Proposition 65, a private citizen intending to bring a private enforcement action must serve notice 60 days before filing suit, and that notice must be accompanied by a certificate of merit executed by either the private citizen or her attorney. (Health & Saf. Code, § 25249.7, subd. (d)(1).) The Notices that Leeman sent to the Trade Associations' members were unquestionably intended to comply with these presuit requirements. The top of each of the Notices stated "60-Day Notice of Violation sent in compliance with California Health and Safety Code § 25249.7(d)." Each of the Notices included a certificate of merit by Leeman's attorney, stating that "there is a reasonable and meritorious case for the private action" and that "information provides a credible basis that all the elements of the plaintiffs' [*sic*] case can be established and the information did not prove that the alleged violator will be able to establish any of the affirmative defenses set forth in the statute." The litigation contemplated by the Notices could have serious financial consequences to the Trade Associations' members, as they could be penalized in an amount up to $2,500 per day for each violation of Proposition 65's requirements. (Health & Saf. Code, § 25249.7, subd. (b)(1).) Further, the amount of those sanctions would be based, in part, on "[w]hether the violator took good faith measures to comply with this chapter and the time these measures were taken." (Health & Saf. Code, § 25249.7, subd. (b)(2)(D).) Thus, it was clearly in the interest of the Trade Associations to take action as soon as possible to determine what, if any, obligations were imposed on their members by Proposition 65.

The need for declaratory relief is made all the more crucial in this case because the USDA has expressed its view that it would likely regard as misleading any Proposition 65 warnings made in connection with meat inspected and approved by the USDA. The USDA has explained that providing Proposition 65 warnings for inspected and approved meat "would only confuse the public as to the wholesomeness of the meat." Thus, without

---

[14] We reject the contention of Leeman's counsel at oral argument that our opinion in *Leeman I* acts as law of the case on the question of whether the Notices gave rise to an actual controversy that should be adjudicated in a declaratory relief action. In *Leeman I* we concluded that "[t]he gravamen of the complaint is not a challenge to the Notices, but rather a dispute over the preemptive effect of the FMIA on Proposition 65" (*Leeman I, supra,* D047115). However, this statement did not address the question of whether Leeman's act of sending the Notices gave rise to an actual controversy. On the contrary, our statement concerned only whether, for purposes of the anti-SLAPP statute, a *challenge* to the Notices was the principal thrust or gravamen of the Trade Associations' lawsuit.

guidance from the court, the Trade Associations' members are caught between the choice of risking sanctions for failing to comply with Proposition 65, on the one hand, and the strong likelihood of USDA disapproval if they attempt to provide Proposition 65 warnings, on the other.

Under these circumstances, a declaratory judgment establishing whether Proposition 65 is preempted by the FMIA will " ' "liquidate doubts with respect to uncertainties or controversies which might otherwise result in subsequent litigation" ' " between the Trade Associations' members and Leeman. (*Meyer, supra*, 45 Cal.4th at p. 647.) Because Leeman indicated her intent to sue, the declaratory relief action was necessary to provide a " ' "guide for [the Trade Associations' members'] future conduct in order to preserve [their] legal rights." ' " (*Ibid.*) Further, the determination of the preemption issue will not be based on a "hypothetical set of facts," but on the concrete facts that currently exist, namely that the Trade Associations' members are selling ground beef and beef liver products, and Leeman contends that the Trade Associations' members must provide warnings with respect to those products pursuant to Proposition 65.

Based on all of these considerations, we conclude that the facts pled in this case established an actual controversy sufficient to support a claim for declaratory relief.[15]

---

[15] Citing *Watson v. Sansone* (1971) 19 Cal.App.3d 1 [96 Cal.Rptr. 387], Leeman contends that a "declaratory relief action filed in response to a mere threat to sue is not proper." We reject this argument. *Watson* concerned a debtor who sued a creditor to determine whether he had a contractual obligation to pay the $514 that the creditor had threatened to sue to collect. *Watson* determined that the claim was not a proper subject for declaratory relief because "the superior court does not have *jurisdiction* to entertain a declaratory relief action where, as here, the issue relates solely to a fully matured claim for money in an amount within the jurisdiction of the municipal court, where nothing remains to be done but the payment of money, and where no declaration of future rights and obligations is sought, or necessary, or proper." (*Id.* at p. 4.) *Watson* does not apply here because the instant case does not seek a declaration based on a threat to sue for an amount payable. We find this case is more analogous to *Zeitlin v. Arnebergh* (1963) 59 Cal.2d 901, 906 [31 Cal.Rptr. 800, 383 P.2d 152], which held that an actual controversy existed to support a declaratory relief complaint where a bookseller wished to sell Tropic of Cancer by Henry Miller, but the Los Angeles City Attorney threatened to prosecute any sellers of the book for distributing obscene material. Our Supreme Court concluded that an actual controversy existed because the city attorney had threatened to prosecute, and the bookseller was entitled to know whether he should refrain from offering the book for sale. (*Zeitlin*, at pp. 907–908.) A similar situation exists here because, due to a threat of an enforcement action by Leeman, the Trade Associations are attempting to determine, on behalf of their members, whether those members are acting in violation of Proposition 65 by continuing to sell meat without giving the required warnings. Indeed, "the only way for a business to obtain a binding preenforcement determination that a Proposition 65 warning is not required with respect to exposing the public to certain chemicals is via a declaratory relief judgment from the superior court." (*Baxter Healthcare Corp. v. Denton* (2004) 120 Cal.App.4th 333, 359 [15 Cal.Rptr.3d 430] (*Baxter*).)

### 3. The Trial Court Did Not Abuse Its Discretion in Exercising Its Power to Provide Declaratory Relief

The next issue with respect to the demurrer is whether the trial court abused its discretion in deciding to exercise its power to grant declaratory relief.

The trial court's discretion to refuse to grant declaratory relief in certain cases is set forth in Code of Civil Procedure section 1061, which provides that "[t]he court may refuse to exercise the power granted by this chapter in any case where its declaration or determination is not necessary or proper at the time under all the circumstances." Leeman sets forth two arguments as to why the trial court abused its discretion.

First, Leeman argues that the trial court should have declined to entertain the declaratory relief action because in the event they were sued for violation of Proposition 65, the Trade Associations' members simply could have raised the issue of federal preemption as an affirmative defense. Leeman contends that "a declaratory relief action is not the proper vehicle by which to adjudicate a claim which can be raised for the first time as a defense in a legal (not equitable) action."

To support her argument, Leeman cites *C.J.L. Construction, Inc. v. Universal Plumbing* (1993) 18 Cal.App.4th 376, 391 [22 Cal.Rptr.2d 360], and *Pacific Electric Ry. Co. v. Dewey* (1949) 95 Cal.App.2d 69, 72 [212 P.2d 255]. However, those cases are not applicable here because they deal with lawsuits that were *already* pending, in which the relevant issue simply could have been raised as an affirmative defense. Here, in contrast, with no enforcement action currently pending, and the Trade Associations' members in need of a ruling to guide their future conduct and enable them to avoid serious financial consequences, the trial court was well within its discretion to exercise its power to grant declaratory relief.[16]

---

[16] We note that *Baxter* determined that a party need not wait until it is named in an enforcement action to obtain declaratory relief regarding its obligations under Proposition 65. (*Baxter, supra,* 120 Cal.App.4th at p. 359 [holding that in the absence of a current enforcement action, a declaratory relief action against the agency responsible for listing cancer-causing chemicals was proper, and observing that "the only way for a business to obtain a binding preenforcement determination that a Proposition 65 warning is not required with respect to exposing the public to certain chemicals is via a declaratory relief judgment from the superior court"].) Significantly, too, this is not a situation where an appropriate procedure has been provided by special statute, but a party is trying to circumvent the statutory procedure by filing a declaratory relief action. (See *Filarsky v. Superior Court* (2002) 28 Cal.4th 419, 433 [121 Cal.Rptr.2d 844, 49 P.3d 194].) ". . . Proposition 65 does not contain specific statutory mechanisms for seeking declaratory relief. Nor does Proposition 65 have any procedural protections for the public . . . that would be circumvented if persons using listed chemicals in

Second, Leeman contends that the trial court should have determined that declaratory relief was not necessary or proper in this case because "the trial court's order granting declaratory relief cannot, as a matter of law, protect [the Trade Associations] and their members from being sued for identical Proposition 65 violations because the Proposition 65 public enforcers—the Attorney General, the 58 District Attorneys and select City Attorneys—are not bound by principles of *res judicata* or collateral estoppel from a judgment against a private enforcer." Pointing out that one of the purposes of declaratory relief is to " ' " 'serve some practical end in quieting or stabilizing an uncertain or disputed jural relation' " ' " (*Meyer, supra*, 45 Cal.4th at p. 647), Leeman argues that this purpose will not be served here because of the limited res judicata effect of any declaratory judgment.

To address Leeman's argument we need not, and do not, consider whether a judgment in this action would have a res judicata effect in a public enforcement action brought against the Trade Associations' members. Regardless of the answer to that question, the trial court was well within its discretion to exercise its power to grant declaratory relief in this case. As we have explained, the dispute between Leeman and the Trade Associations' members constitutes an actual controversy with significant financial consequences. There is no indication in the record that any other party was threatening to file an enforcement action against the Trade Associations' members. Under these circumstances, the trial court could reasonably, and within its discretion, decide that it was a necessary and proper use of its powers to resolve the dispute between Leeman and the Trade Associations' members. Even if ·binding only as to Leeman, such a judgment would " ' " 'quiet[] or stabiliz[e] an uncertain or disputed jural relation' " ' " and " ' "liquidate doubts with respect to uncertainties or controversies which might otherwise result in subsequent litigation." ' " (*Meyer, supra*, 45 Cal.4th at p. 647 [describing two purposes of declaratory relief].)

B.  *The Summary Judgment Motion*

1.  *The Doctrine of Federal Preemption*

We next consider Leeman's appeal of the trial court's ruling on the Trade Associations' motion for summary judgment, in which the court concluded that the FMIA preempts Proposition 65's warning requirements as applied to meat.

■  Federal preemption of state law under the supremacy clause of the United States Constitution, article VI, clause 2, " 'may be either express or

---

their products were permitted to seek preemptive declaratory relief under Code of Civil Procedure section 1060, rather than raise the exemption as a defense in an enforcement action." (*Baxter*, at p. 357.)

implied, and "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." ' " (*Shaw v. Delta Air Lines, Inc.* (1983) 463 U.S. 85, 95 [77 L.Ed.2d 490, 103 S.Ct. 2890].)

Under express preemption, "Congress explicitly may define the extent to which its enactments pre-empt state law." (*Schneidewind v. ANR Pipeline Co.* (1988) 485 U.S. 293, 299 [99 L.Ed.2d 316, 108 S.Ct. 1145].) "Pre-emption fundamentally is a question of congressional intent . . . and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one." (*English v. General Electric Co.* (1990) 496 U.S. 72, 78–79 [110 L.Ed.2d 65, 110 S.Ct. 2270], citation omitted (*English*).)

Implied preemption applies when Congress has not explicitly addressed the preemptive effect of a statute, and may arise in several different ways. (See *English, supra*, 496 U.S. at p. 79 [implied preemption arises "in the absence of explicit statutory language"].) First, implied preemption arises when state law "regulates conduct in a field that Congress intended the Federal Government to occupy exclusively." (*Ibid.*) Second, even when Congress has not exclusively occupied the field covered by the state law, " 'state law is still pre-empted to the extent it actually conflicts with federal law . . . .' " (*California Coastal Comm'n v. Granite Rock Co.* (1987) 480 U.S. 572, 581 [94 L.Ed.2d 577, 107 S.Ct. 1419] (*California Coastal Comm'n*).) Such a conflict may arise either (1) " 'when it is impossible to comply with both state and federal law' " or (2) " 'where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress . . . .' "[17] (*California Coastal Comm'n*, at p. 581.)

### 2. We May Affirm Based on Any of the Theories of Preemption Set Forth in the Trade Associations' Motion for Summary Judgment

In both their complaint and summary judgment motion, the Trade Associations advanced alternative theories of preemption. First, based on the FMIA's preemption provision, the Trade Associations contended that the FMIA expressly preempted Proposition 65's warning requirements. Second, the Trade Associations contended that implied preemption applied because (a) it would be impossible to comply with both the FMIA and Proposition 65 with respect to meat regulated by the FMIA; and (b) compliance with Proposition 65 with respect to meat would stand as an obstacle to the accomplishment of the full purposes and objectives of Congress in enacting the FMIA.

---

[17] It is important to understand, however, that these categories of implied preemption are not "rigidly distinct." (*English, supra*, 496 U.S. at p. 79, fn. 5.)

As we have explained, in granting summary judgment in favor of the Trade Associations, the trial court concluded that implied preemption applied, but express preemption did not. Leeman has purported to appeal from the *implied* preemption ruling,[18] and the Trade Associations have purported to file a protective cross-appeal from the *express* preemption ruling. The Trade Associations suggest that we should not consider the express preemption issue until and unless we have concluded that implied preemption does not apply.

However, as we will explain, we conclude that our analysis of the trial court's summary judgment should not proceed in the order suggested by the parties, and that instead, we may first consider express preemption, and only thereafter, if necessary, consider implied preemption. We reach this conclusion because, although nominally setting forth separate causes of actions for each of the three alternative preemption theories, the complaint seeks only a single type of relief from the court, namely a declaration that under the supremacy clause (U.S. Const., art. VI, cl. 2), the FMIA preempts Proposition 65's warning requirements with respect to meat regulated by the FMIA. Consistent with this single focus, the Trade Associations' motion for summary judgment sought a ruling that the FMIA preempted Proposition 65 in the context of meat on any of "three independent grounds for preemption."[19]

In short, the motion for summary judgment presented the single issue of whether, under the supremacy clause (U.S. Const., art. VI, cl. 2), the FMIA preempts Proposition 65's warning requirements as to meat. The doctrines of express and implied preemption were merely separate possible approaches presented to the trial court for resolving that issue.

"Where there is sufficient legal ground to support the granting of [a summary judgment] motion, the order will be upheld regardless of the grounds relied upon by the trial court." (*Becerra v. County of Santa Cruz* (1998) 68 Cal.App.4th 1450, 1457 [81 Cal.Rptr.2d 165].) "If summary judgment was properly granted on any ground, we must affirm regardless of whether the court's reasoning was correct." (*Jackson v. Ryder Truck Rental,*

---

[18] We note that although Leeman states that she is appealing from the implied preemption ruling, her opening appellate brief thoroughly discusses the express preemption issue. The express preemption issue was also raised in the Trade Associations' cross-appeal, and in the response and reply to that cross-appeal. Accordingly, we have the benefit of four separate briefs on the issue of express preemption.

[19] Further, in ruling on the summary judgment motion, the trial court viewed the complaint and the summary judgment ruling as setting forth a single issue, summarizing its ruling by simply stating that "[the Trade Associations'] motion for summary judgment is granted." Only in explaining its conclusion on the single issue of whether the FMIA preempted Proposition 65 with respect to meat did the trial court consider the alternative theories of express and implied preemption, concluding that implied preemption applied, but express preemption did not.

*Inc.* (1993) 16 Cal.App.4th 1830, 1836 [20 Cal.Rptr.2d 913].) Based on this principle, we may affirm the trial court's summary judgment ruling in favor of the Trade Associations on any ground set forth in the motion for summary judgment. Because the doctrine of express preemption was one of the grounds asserted in the Trade Associations' summary judgment motion, we may rely on that doctrine when analyzing Leeman's challenge to the trial court's summary judgment ruling in favor of the Trade Associations, even though the trial court did not rely on it.[20]

### 3. *Express Preemption*

We accordingly proceed to consider whether the FMIA expressly preempts Proposition 65's warning requirements with respect to meat.

To determine the scope of an express preemption provision, we start with the premise that " '[t]he purpose of Congress is the ultimate touchstone' in every pre-emption case," and we apply " 'the assumption that the historic police powers of the States were not to be superseded . . . unless that was the clear and manifest purpose of Congress.' " (*Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 485 [135 L.Ed.2d 700, 116 S.Ct. 2240].) To determine congressional intent, we look to "the language of the pre-emption statute and the 'statutory framework' surrounding it," as well as "the 'structure and purpose of the statute as a whole.' " (*Id.* at p. 486.)

As we have explained, the FMIA's preemption provision provides, in part, as follows: "Marking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under this chapter may not be imposed by any State or Territory or the District of Columbia with respect to articles prepared at any establishment under inspection in accordance with the requirements under subchapter I of this chapter, but any State or Territory or the District of Columbia may, consistent with the requirements under this chapter, exercise concurrent jurisdiction with the Secretary over articles

---

[20] Indeed, it is appropriate for us to first focus on express preemption because, as the Supreme Court has explained, "[w]hen Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a 'reliable indicium of congressional intent with respect to state authority,' [citation] 'there is no need to infer congressional intent to pre-empt state laws from the substantive provisions' of the legislation. [Citation.] Such reasoning is a variant of the familiar principle of *expressio unius est exclusio alterius*: Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." (*Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 517 [120 L.Ed.2d 407, 112 S.Ct. 2608].) "[A]n express definition of the pre-emptive reach of a statute 'implies'—*i.e.*, supports a reasonable inference—that Congress did not intend to pre-empt other matters . . ." but does not "entirely foreclose[] any possibility of implied pre-emption." (*Freightliner Corp. v. Myrick* (1995) 514 U.S. 280, 288 [131 L.Ed.2d 385, 115 S.Ct. 1483].)

required to be inspected under said subchapter I, for the purpose of preventing the distribution for human food purposes of any such articles which are adulterated or misbranded and are outside of such an establishment, or, in the case of imported articles which are not at such an establishment, after their entry into the United States." (21 U.S.C. § 678.) The Trade Associations contend that this provision applies here because the warning required by Proposition 65 would constitute "labeling . . . requirements in addition to, or different than, those made under this chapter." (21 U.S.C. § 678.) Leeman does not appear to dispute that a Proposition 65 warning is in addition to, or different than, any requirement set forth in the FMIA. Nor does she appear to dispute that a Proposition 65 warning *affixed directly to a package* containing meat would constitute "labeling" within the meaning of the FMIA's preemption provision.[21]

Leeman's argument, instead, focuses on the fact that Proposition 65 permits point of sale warnings.[22] According to Leeman, point of sale warnings do not constitute "labeling," and thus, Proposition 65 does not create *"labeling* . . . requirements in addition to, or different than, those made under [the FMIA]."[23] (21 U.S.C. § 678, italics added.) The issue before us,

---

[21] Of course, Proposition 65's warning requirement would apply only if indeed, as Leeman claims, the beef and beef liver products at issue contained chemicals listed as carcinogens or reproductive toxins and if the proponents of those products could not show "that the exposure poses no significant risk assuming lifetime exposure." (Health & Saf. Code, § 25249.10, subd. (c).) Those issues were not presented for determination in this litigation.

[22] In our discussion, we use the term "point of sale warning" to refer to a warning required by Proposition 65 that is not directly affixed to a product package but that is, as required by the regulations implementing Proposition 65, "displayed at the retail outlet with such conspicuousness, as compared with other words, statements, designs, or devices in the label, labeling or display as to render it likely to be read and understood by an ordinary individual under customary conditions of purchase or use" (Cal. Code Regs., tit. 27, § 25603.1, subd. (c)), and "reasonably calculated, considering the alternative methods available under the circumstances, to make the warning message available to the individual prior to exposure." (Cal. Code Regs., tit. 27, § 25601.)

[23] Leeman also briefly argues that the FMIA does not preempt Proposition 65 with respect to meat because of the exception found in 21 United States Code section 678, under which a state may "consistent with the requirements under this chapter, exercise concurrent jurisdiction with the Secretary over articles required to be inspected under said subchapter I, *for the purpose of preventing the distribution* for human food purposes of any such articles which are adulterated or misbranded and are outside of such an establishment." (21 U.S.C. § 678, italics added.) We reject this argument. The exception in 21 United States Code section 678 allows the state to exercise concurrent jurisdiction *"for the purpose of preventing the distribution* for human food purposes of any such articles which are adulterated or misbranded." (*Ibid.*, italics added.) Proposition 65 is not aimed at *preventing the distribution* of products containing carcinogenic chemicals and reproductive toxins. Instead, it is aimed at providing warnings for products that have entered the stream of commerce.

Citing *County Sanitation Dist. No. 2 v. County of Kern* (2005) 127 Cal.App.4th 1544, 1610 [27 Cal.Rptr.3d 28], Leeman also argues that "[t]he power to prohibit an activity necessarily includes the power to regulate it . . . ," and thus the state's power to prevent distribution of

therefore, is whether a point of sale warning on meat, provided pursuant to Proposition 65, constitutes "labeling" within the meaning of the FMIA's preemption provision.

### a. *Statutory Definition of Labeling*

To decide whether point of sale warnings required under Proposition 65 for meat would constitute "labeling" within the meaning of the FMIA, we first look to the FMIA's definition of that term.

■ The FMIA specifically defines the terms "label" and "labeling." A "label" is "a display of written, printed, or graphic matter upon the immediate container (not including package liners) of any article." (21 U.S.C. § 601(*o*).) "Labeling" is defined more broadly as "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." (21 U.S.C. § 601(p).) The Trade Associations contend that point of sale warnings are "labeling" because they constitute "written, printed, or graphic matter . . . *accompanying* such article." (*Ibid.*, italics added.)

Although the plain language of the statute is a starting point for our analysis, it is not dispositive of the issue before us. "Labeling" is defined as matter "*upon*" an article *and* matter "*accompanying*" an article. (21 U.S.C. § 601(p), italics added.) Thus, from the face of the statute it is clear that "labeling" need not be *physically attached* to the article, and instead may "*accompany*[]" it. (*Ibid.*, italics added.) Although point of sale warnings are not physically attached to an article, the statute does not *rule out* that they may be classified as "labeling." However, the crucial question is whether a point of sale warning can be viewed as "accompanying" the meat to which it relates. To answer that question, we turn to other sources.

### b. *USDA's Interpretation of "Labeling"*

One source we may consider when deciding whether the FMIA's definition of labeling extends to point of sale materials, is the interpretation of the term "labeling" adopted by the USDA.

adulterated products includes the power to enact labeling requirements concerning such products. We do not find the principle expressed in *County Sanitation* to be applicable. *County Sanitation* concluded that because Congress, in a federal environmental law, had "authorized a local ban on the land application of sewage sludge [citation], one can strongly infer that Congress also authorized local governments to impose a lesser burden on commerce such as . . . heightened treatment standards." (*Ibid.*) Here, because the FMIA expressly provides that states may not make "labeling . . . requirements in addition to, or different than" those imposed by the FMIA (21 U.S.C. § 678), the only rational inference is that Congress did not intend to allow states to enact labeling requirements concerning meat, regardless of the fact that states may, in certain circumstances, act to prevent its distribution.

■ As we have explained, the USDA is the agency charged with administering the FMIA. "[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer . . . ." (*Chevron U. S. A. v. Natural Res. Def. Council* (1984) 467 U.S. 837, 844 [81 L.Ed.2d 694, 104 S.Ct. 2778] (*Chevron*).) Thus, "[a]lthough not determinative, the construction of a statute by those charged with its administration is entitled to great deference, particularly when that interpretation has been followed consistently over a long period of time." (*United States v. Clark* (1982) 454 U.S. 555, 565 [70 L.Ed.2d 768, 102 S.Ct. 805].)[24]

In support of the motion for summary judgment, the Trade Associations submitted evidence of the USDA's interpretation of the term "labeling." As reflected in a 1994 policy memorandum from the USDA and letters written by USDA officials between 1998 and 2006, the USDA has interpreted the term "labeling" as used in the FMIA to include point of sale materials since at least 1994.[25] Further, the USDA specifically views point of sale warnings provided pursuant to Proposition 65 as constituting "labeling" within the meaning of the FMIA's preemption clause.[26]

---

[24] Of course, "[t]he judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." (*Chevron, supra*, 467 U.S. at p. 843, fn. 9.)

[25] A 1987 letter in the record from the United States Secretary of Agriculture to the Governor of California discussed the preemptive effect of the FMIA as applied to Proposition 65's warning requirements, but did not specifically discuss whether the USDA interpreted the term "labeling" to encompass point of sale materials. Similarly, another 1987 letter in the record to a food manufacturer from the USDA states that the FMIA preempts Proposition 65 warnings on the packaging of meat, but does not address whether warnings on point of sale materials are preempted.

Leeman points out that in a brief filed in 1981, the USDA took the position that "[p]lacards and other material not moving with products have not been considered to be labeling." Despite the fact that the USDA's interpretation of "labeling" has evolved, we nevertheless give appropriate deference to the interpretation that it has held since at least 1994. A " 'change in interpretation alone presents no separate ground for disregarding' " an agency's present interpretation of a statute. (*Kennedy v. Plan Administrator for DuPont Sav. and Investment Plan* (2009) 555 U.S. ___, ___, fn. 7 [172 L.Ed.2d 662, 673, fn. 7, 129 S.Ct. 865, 872, fn. 7]; see also *National Broiler Council v. Voss* (9th Cir. 1994) 44 F.3d 740, 747, fn. 11 (*Voss*) ["Also irrelevant is the fact that the USDA's position on the labeling of 'fresh' poultry has evolved over time . . ."].)

[26] The Trade Associations filed a request that we take judicial notice of a memorandum signed by President Barack Obama and appearing in the Federal Register, titled "Memorandum for the Heads of Executive Departments and Agencies" regarding "Preemption" (74 Fed.Reg. 24693 (May 20, 2009)). The Trade Associations argue that the document is relevant to this appeal "in the context of whether President Obama's request to federal agencies will cause the U.S. Department of Agriculture to reconsider its informal interpretive opinions that the Federal Meat Inspection Act preempts Proposition 65's warning requirements as to meat products." Leeman has opposed the request for judicial notice on the ground that the memorandum is irrelevant and represents a matter that occurred after the judgment at issue in this appeal. We deny the

### c. *Federal Case Law Interpreting the Term "Labeling"*

Because the USDA's interpretation of the statute is not determinative (*Chevron, supra,* 467 U.S. at p. 843, fn. 9), we also look to case law to determine whether there is support for the view that point of sale warnings constitute "labeling" under the FMIA.

### i. *Case Law Interpreting the Term "Labeling" in the Federal Food, Drug, and Cosmetic Act*

■   We begin our discussion with cases interpreting the term "labeling" in an analogous statute—the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301 et seq.) (FDCA). Among other things, the FDCA prohibits the introduction into commerce of food and drugs with "labeling" that is false or misleading. (21 U.S.C. §§ 331, 343, 352.) As does the FMIA, the FDCA defines "labeling" as "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article" (21 U.S.C. § 321(m)), and defines "label" as "a display of written, printed, or graphic matter upon the immediate container of any article." (21 U.S.C. § 321(k).)[27]

In *Kordel v. United States, supra,* 335 U.S. 345 (*Kordel*), the United States Supreme Court interpreted the term "labeling" in the FDCA in the course of considering an appeal challenging a criminal conviction for introducing misbranded drugs into commerce. The precise issue was whether "circulars or pamphlets distributed to consumers" for vitamin products, which were "displayed in stores in which the . . . products were on sale" or "given away with

---

request to take judicial notice because the document at issue is not relevant to our decision in that it does not contain any additional information about the USDA's interpretation of the term "labeling" in the FMIA. (See *Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6 [76 Cal.Rptr.2d 749, 958 P.2d 1062] [declining to take judicial notice of materials that are not "necessary, helpful, or relevant"].)

[27] Cases discussing the term "labeling" in the FDCA are especially relevant here because Congress deliberately took the FMIA's definition of "labeling" from the FDCA when it amended the FMIA through the Wholesome Meat Act (Pub.L. No. 90-201, § 408, 81 Stat. 600; Sen.Rep. No. 90-799, 1st Sess. (1967), reprinted in 1967 U.S. Code Cong. & Admin. News, p. 2196; see also *American Meat Institute v. Ball* (W.D.Mich. 1976) 424 F.Supp. 758, 762 (*Ball*) [explaining that because the FMIA's definition of "labeling" was based on the FDCA, "the court may look for guidance to cases interpreting the identical language of the [FDCA] . . ." when interpreting the term "labeling" in the FMIA]).

We note however, that although the FDCA is analogous to the FMIA insofar as it contains the same definition of "labeling," it did not, at the time *Kordel v. United States* (1948) 335 U.S. 345 [93 L.Ed. 52, 69 S.Ct. 106] was decided, contain a parallel express preemption provision that uses the term "labeling." Currently, the FDCA contains certain specific express preemption provisions concerning labeling, such as the preemption provision enacted as part of the Nutrition Labeling and Education Act of 1990 (21 U.S.C. § 343-1; Pub.L. No. 101-535, § 6 (Nov. 8, 1990) 104 Stat. 2362).

the sale of products" (*Kordel*, at pp. 346–347), constituted "labeling" within the meaning of the FDCA. Due to the phrase "accompanying such article" in the definition of "labeling" (21 U.S.C. § 321(m)), *Kordel* broadly interpreted "labeling" as not requiring "physical attachment or contiguity." (*Kordel*, at p. 351.)

Of central importance to our own analysis, *Kordel* defined the term "accompanying." It stated that "[o]ne article or thing is *accompanied* by another when it supplements or explains it, in the manner that a committee report of the Congress accompanies a bill. No physical attachment one to the other is necessary. It is the textual relationship that is significant." (*Kordel, supra*, 335 U.S. at p. 350, italics added.) Applying this definition, the dispositive issue was whether "[t]he false and misleading literature . . . was designed for use in the distribution and sale . . ." of the product. (*Ibid.*)

Several years later in *V.E. Irons, Inc. v. U.S.* (1st Cir. 1957) 244 F.2d 34, 37 (*V.E. Irons*), a federal appellate court, relying on *Kordel*, concluded that "certain leaflets and various issues of a newsletter" that accompanied the sale of nutritional supplements constituted "labeling" within the meaning of the FDCA. (*V.E. Irons*, at pp. 37, 39.) Concluding that "the term 'labeling' must be given a broad meaning to include all literature used in the sale of food and drugs," the court affirmed the defendants' criminal conviction for introducing misbranded articles into commerce. (*Id.* at p. 39.)

More recently, a federal district court applied *Kordel* in a lawsuit contending that the FDCA's nutritional labeling requirements preempted a city law requiring certain restaurants to provide calorie content information on their menus. (*New York State Restaurant Ass'n v. New York City Bd. of Health* (S.D.N.Y. 2007) 509 F.Supp.2d 351, 358 (*New York State Restaurant Ass'n*), quoting 21 U.S.C. § 343-1(a)(5).) The issue was whether the city law regulated " 'claim[s] . . . made in the label or labeling of the food.' " (*New York State Restaurant Ass'n*, at p. 358.) The court concluded that under the "broad" definition of "labeling" in the FDCA, "menu, menu-boards, signs, placards, and posters would all be considered labeling of a food item" as those items all " 'supplement[] or explain[] [the article].' " (*New York State Restaurant Ass'n*, at p. 360, fn. 13, quoting *Kordel, supra*, 335 U.S. at p. 350.)

### ii. Case Law Defining the Term "Labeling" in the Federal Insecticide, Fungicide, and Rodenticide Act

Cases decided under the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. §§ 136–136y) (FIFRA) also address the term "labeling." FIFRA regulates pesticides by requiring that they be registered

with the United States Environmental Protection Agency (EPA) before being sold or used. (7 U.S.C. § 136a; *Bates v. Dow Agrosciences LLC* (2005) 544 U.S. 431, 437–438 [161 L.Ed.2d 687, 125 S.Ct. 1788].) As part of the registration process, the EPA determines whether the product labeling is adequate. (7 U.S.C. § 136a(c)(5)(B); *Bates*, at p. 438.)

FIFRA contains a preemption clause providing that a state "shall not impose or continue in effect any requirements for *labeling* or packaging in addition to or different from those required under this subchapter." (7 U.S.C. § 136v(b), italics added.) FIFRA defines "labeling" as including "all labels and all other written, printed, or graphic matter . . . [¶] . . . *accompanying* the pesticide or device at any time." (7 U.S.C. § 136(p)(2)(A), italics added.) FIFRA also defines the term "label" to mean "the written, printed, or graphic matter on, or attached to, the pesticide or device or any of its containers or wrappers." (7 U.S.C. § 136(p)(1).)[28]

Leeman's express preemption argument relies heavily on the Ninth Circuit Court of Appeals decision in *Chemical Specialties Mfrs. Ass'n, Inc. v. Allenby* (9th Cir. 1992) 958 F.2d 941 (*Allenby*), which considered whether FIFRA preempts Proposition 65 point of sale warnings for pesticides. *Allenby* interpreted the term "labeling" in FIFRA to be restricted to material that will "accompany the product during the period of use." (*Allenby*, at p. 946.) Applying this definition, *Allenby* concluded that because "[p]oint-of-sale signs are not attached to the immediate container of a product and *will not accompany the product during the period of use* . . . ," Proposition 65 point of sale warnings did not constitute "labeling," and thus were not preempted by FIFRA. (*Allenby*, at p. 946, italics added.)[29]

*Allenby* acknowledged that *Kordel, supra*, 335 U.S. 345, defined "labeling" in the FDCA to include supplemental literature not attached to the product, but it attempted to distinguish *Kordel* on three grounds: (1) "the written materials in *Kordel* were aimed at the ultimate user . . . , not the purchaser that is targeted by Proposition 65" (*Allenby, supra*, 958 F.2d at p. 947);[30]

---

[28] FIFRA's definition of "labeling" is not identical to that employed in the FMIA, but is somewhat similar in that both statutes use the word "accompanying" in the definition of "labeling" (compare 7 U.S.C. § 136(p)(2) with 21 U.S.C. § 601(p)), and both statutes contrast the concept of "labeling" with the narrower concept of a "label" that is attached to a product (compare 7 U.S.C. § 136(p)(1) with 21 U.S.C. § 601(*o*)).

[29] Leeman also cites an earlier opinion from the same federal district court that issued the lower court opinion in *Allenby, supra*, 958 F.2d 941. In *D-Con Co. v. Allenby* (N.D.Cal. 1989) 728 F.Supp. 605, 607, the court decided, without explaining its reasoning, that Proposition 65 point of sale warnings for pesticides would not constitute "labeling" preempted by FIFRA.

[30] In fact, the supplemental materials at issue in *Kordel* consisted of pamphlets about the "efficacy" of the nutritional supplements, and were either displayed in the stores where the products were for sale, were given away with the sale of the products, sold independently of

(2) the supplemental materials in *Kordel* concerned directions for use, which, by law, were required to appear on a label (*Allenby, supra*, 958 F.2d at p. 947);[31] and (3) the supplemental materials at issue in *Kordel* were for the purpose of "circumvent[ing] the [FDCA] rather than supplement[ing] it" (*Allenby, supra*, 958 F.2d at p. 947). *Allenby* did not, however, consider the portions of *Kordel* that we view as the most applicable here, namely (1) *Kordel*'s statement that "accompanying" in the definition of "labeling" means "supplement[ing] or explain[ing]" the product, and (2) *Kordel*'s focus on whether the pamphlets were "designed for use in the distribution and sale of the" product. (*Kordel, supra*, 335 U.S. at p. 350.)

Leeman also relies on the Second Circuit Court of Appeals opinion in *New York State Pesticide Coalition v. Jorling* (2d Cir. 1989) 874 F.2d 115 (*Jorling*), which interpreted the term "labeling" in FIFRA. At issue in *Jorling* was a New York law requiring commercial pesticide applicators to give customers a list of the chemicals to be applied (including the warnings appearing on the pesticide labels) along with a " 'cover sheet' " containing further warnings and safety information and in some instances to notify the public in newspapers of the pesticide application. (*Jorling*, at pp. 116–117.) *Jorling* decided that the notification materials did not constitute "labeling" preempted by FIFRA because the target audience was the public who may be exposed to the pesticides rather than the user of the pesticide. (*Jorling*, at p. 119.) *Jorling* approved of "the EPA's position that 'labeling' comprises those materials designed to accompany the product through the stream of commerce to the end user, but not those designed to notify the purchasers of services or the general public." (*Id.* at p. 120.)[32]

---

the products, or mailed to customers. (*Kordel, supra*, 335 U.S. at pp. 346–347.) It is not clear why *Allenby* understood the material in *Kordel* to be targeted only at users of the products when that material was displayed where the products were offered for sale and described the products' efficacy.

[31] As described in *Kordel, supra*, 335 U.S. at page 347, the applicable statute stated that a drug was misbranded if, among other things, its labeling did not bear " 'adequate directions for use.' " *Kordel* explained that the pamphlets at issue "explained" the "uses" of the nutritional supplement at issue, and "[n]owhere else was the purchaser advised how to use them." (*Id.* at p. 348.)

[32] *Allenby* cited *Jorling* in support of its definition of labeling as material that will "accompany the product during the period of use." (*Allenby, supra*, 958 F.2d at p. 946.) However, it is not clear to us that *Jorling* supports *Allenby*'s heavy reliance on it for that proposition. *Jorling* stated in the course of its discussion that " 'labeling' is designed to be read and followed by the end user" and is "[g]enerally . . . conceived as being attached to the immediate container of the product in such a way that it can be expected to remain affixed during the period of use." (*Jorling, supra*, 874 F.2d at p. 119 [citing EPA regulations].) However, those statements are dicta because the issue presented in *Jorling* was whether notification requirements *after* the product left the stream of commerce could be considered labeling. Unlike in *Allenby*, the issue in *Jorling* was *not* whether signage in a retail store that does not accompany the product to the end user constitutes "labeling."

### iii. *Case Law Defining the Term "Labeling" in the FMIA*

We are aware of only one published authority that considers the definition of the term "labeling" as used in the FMIA.

In *Ball, supra,* 424 F.Supp. 758, a federal district court considered a Michigan law requiring "that grocers and restauranteurs who sell or serve meats not meeting the state's ingredient requirements post a red-on-yellow notice of prescribed size, stating: 'The following products do not meet Michigan's high meat ingredient standards but do meet the lower federal standards.'" (*Id.* at p. 763.) The notice was "to be posted on a placard 'clearly visible to a consumer'" or on a restaurant's menu. (*Ibid.*)

Citing *Kordel, supra,* 335 U.S. 345, *Ball* acknowledged that under the identically worded FDCA, "brochures and point of sale display advertising . . . can constitute labeling . . . ." (*Ball, supra,* 424 F.Supp. at p. 763.) *Ball* concluded, however, that *Kordel* and other cases like it were not applicable because they "involve[d] similar incidents of misbranding or fraudulent misrepresentations *by manufacturers or others involved in the distribution or sales of a product.*" (*Ball,* at p. 765, italics added.) *Ball* concluded that "'the primary intent of the federal labeling requirements is to regulate what *producers* say about their products'" (*id.* at p. 762, italics added), and that "Congress was seeking to protect consumers and to curb misleading information provided by those involved in manufacturing or selling regulated products" (*id.* at p. 766). Accordingly, perceiving not "the slightest intent to prohibit a state from communicating information to its citizen-consumers in order to assist them in making informed purchasing decisions" (*ibid.*) and applying the presumption against preemption of state consumer protection laws absent clear congressional intent, *Ball* concluded that the notices required by the Michigan law did not constitute "labeling" within the meaning of the FMIA (*Ball,* at p. 767).[33]

### d. Kordel*'s View of the Term "Labeling" Is Applicable Here*

Leeman acknowledges that some of the case law we have discussed above, particularly *Kordel, supra,* 335 U.S. 345, and *V.E. Irons, supra,* 244 F.2d 34, could support a conclusion that point of sale warnings regarding meat are "labeling" within the meaning of the FMIA. Leeman suggests that *Kordel* and

---

[33] Leeman cites *Voss, supra,* 44 F.3d 740, and *Grocery Mfrs. of America, Inc. v. Gerace* (2d Cir. 1985) 755 F.2d 993, contending that they "assumed," without directly deciding, that point of sale displays constituted labeling within the meaning of the statutes they considered, namely the Poultry Products Inspection Act (21 U.S.C. 451 et seq.), and the FDCA. We find neither *Gerace* nor *Voss* helpful to our analysis of whether point of sale warnings constitute labeling, as they did not decide that issue.

*V.E. Irons* should not apply because they did not consider the definition of "labeling" in the context of federal preemption of a state consumer law.[34] Leeman contends that we instead should follow *Allenby, supra*, 958 F.2d 941, and *Ball, supra*, 424 F.Supp. 758, because they dealt with the same issue presented here, namely whether a point of sale display was "labeling" within the meaning of a preemption provision. In short, Leeman argues that for the purposes of a preemption analysis, "labeling" should be given a narrow definition, but for the purposes of deciding whether a regulated party has used misleading labeling, the term should be given a broad meaning.[35]

■ We reject this argument. As we have explained, the legislative history of the FMIA's preemption provision shows that Congress defined "labeling" in that provision by adopting the definition of "labeling" found in the FDCA. (See fn. 27, *ante*.) In 1967, when the FMIA's preemption provision was adopted, along with its definition of labeling (Pub.L. No. 90-201, § 408, 81 Stat. 600), *Kordel* had already broadly interpreted "labeling" to mean material that accompanies a product in the sense that it "supplements or explains it," but is not necessarily physically attached. (*Kordel, supra*, 335 U.S. at p. 350.) ■ "We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts." (*Goodyear Atomic Corp. v. Miller* (1988) 486 U.S. 174, 184–185 [100 L.Ed.2d 158, 108 S.Ct. 1704]; see also *McLean v. U.S.* (4th Cir. 2009) 566 F.3d 391, 396 [" 'It is firmly entrenched that Congress is presumed to enact legislation with knowledge of the law; that is with the knowledge of the interpretation that courts have given to an existing statute.' "].) Under these circumstances, we conclude that Congress's intention was to apply the definition of "labeling" from the FDCA, as interpreted by *Kordel*, to the term "labeling" used in the FMIA's preemption provision. Accordingly, we reject Leeman's contention that we should ignore *Kordel*'s definition of "labeling" when deciding whether point of sale warnings constitute "labeling" within the meaning of the FMIA's preemption provision on the ground that *Kordel* did not deal with the issue of federal preemption.

---

[34] The amicus curiae brief that the Attorney General has filed in support of Leeman's appeal also argues that we should not follow *Kordel* and *V.E. Irons* because those cases were not decided in the context of a federal preemption analysis concerning state consumer laws.

[35] Leeman does not discuss *New York State Restaurant Ass'n, supra*, 509 F.Supp.2d 351, even though the Trade Associations cite that case in support of their express preemption argument, and it lends support in the same manner as *Kordel* and *V.E. Irons*. Significantly, the issue of "labeling" in *New York State Restaurant Ass'n* arose in the context of a preemption challenge (*id.* at p. 360, fn. 13), and thus Leeman would not be able to distinguish that case in the same manner that she attempts to distinguish *Kordel* and *V.E. Irons*, namely by arguing that "labeling" should be interpreted differently in the context of a preemption analysis.

Further, although Leeman contends that we should follow *Allenby, supra,* 958 F.2d 941, and *Ball, supra,* 424 F.Supp. 758, we do not find the reasoning of those opinions to be persuasive.

### i.  Allenby *Is Not Persuasive*

As we have explained, when deciding whether Proposition 65 point of sale warnings constituted "labeling" within the meaning of FIFRA's preemption clause, *Allenby*'s central legal assumption was that "labeling" must "accompany the product during . . . use." (*Allenby, supra,* 958 F.2d at p. 946.) As we have seen, this assumption was drawn, in part, from *Jorling, supra,* 874 F.2d 115, which stated, in dicta, that in the context of pesticides, " 'labeling' is designed to be read and followed by the end user." (*Id.* at p. 119.) *Allenby* concluded that because a point of sale warning did not accompany the product during use, it was not "labeling" preempted by FIFRA. (*Allenby*, at p. 946.)

Whatever value there may be under FIFRA to focus, during a preemption analysis, on whether the material accompanies the pesticide *during use*, we see no basis for importing that focus into the FMIA. The FMIA states that its purpose is to protect the "health and welfare of consumers . . . by assuring that meat and meat food products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged." (21 U.S.C. § 602.) Common sense establishes that the goal of protecting the health and welfare of consumers is advanced by ensuring that the meat is properly labeled at *all points* in its travel from the slaughterhouse to the kitchen, including during the period that it is offered for sale by a retailer. We see no reason why the FMIA's preemption of additional or different state requirements should apply only to those materials that will *remain* with the product when it is being used. Accordingly, we find *Allenby* to be inapplicable here.[36]

### ii.  Ball *Is Not Persuasive*

We are also not persuaded that we should follow *Ball, supra,* 424 F.Supp. 758, to conclude that point of sale warnings are not "labeling" under the

---

[36] Further, as we have explained, we do not find *Allenby*'s attempt to distinguish *Kordel* to be persuasive because *Allenby* did not acknowledge (1) *Kordel*'s statement that "accompanying" in the definition of "labeling" means "supplement[ing] or explain[ing]" the product, and (2) *Kordel*'s focus on whether the pamphlets were "designed for use in the distribution and sale of the" product. (*Kordel, supra,* 335 U.S. at p. 350.) Further, *Allenby*'s attempt to distinguish *Kordel* is unpersuasive because *Allenby* overlooked the fact that *Kordel* dealt with point of sale materials as well as materials that were available to the end user of the product. (*Kordel*, at p. 346 ["Some of the literature was displayed in stores in which the . . . products were on sale."].)

FMIA. As we have explained, *Ball* concluded that point of sale signs required by Michigan informing consumers that meat products did not conform to state ingredient requirements were not "labeling" within the meaning of the FMIA. *Ball*'s analysis was premised, in part, on its view (1) that " 'the primary intent of the federal labeling requirements is to regulate what *producers* say about their products' " (424 F.Supp. at p. 762, italics added); and (2) that "what Congress sought to reach . . . was fraudulent or deceptive practices *by manufacturers or distributors* of regulated products . . ." (*id.* at p. 764, italics added). However, because sparse legislative history exists for the relevant portions of the FMIA, *Ball* based these statements on its review of the legislative history and case law concerning the FDCA, not the FMIA. *Ball* noted that in those materials, "[n]othing . . . indicates the slightest intent to prohibit a state from communicating information to its citizen-consumers in order to assist them in making informed purchasing decisions." (424 F.Supp. at p. 766.)

■ *Ball*'s reasoning is flawed because it failed to recognize that the FDCA, unlike the FMIA, did not contain a preemption provision prohibiting states from enacting additional "labeling" requirements. In the absence of a preemption provision, the case law and legislative history for the FDCA could not have reflected an intent to define "labeling" to preclude states from requiring retailers to provide additional information to consumers. However, as we have explained, Congress demonstrated precisely that intent in enacting the FMIA when it included a preemption provision. Indeed, by (1) adopting the FDCA's broad definition of "labeling," which had been interpreted by *Kordel* to include point of sale materials, and (2) using that term in the FMIA's preemption clause, Congress indicated its intent to preclude states from enacting point of sale labeling requirements that are different from or in addition to those required by the FMIA.[37]

---

[37] Further, *Ball* premised its decision on the observation that the FMIA was intended as a consumer protection statute, and that therefore, the term "labeling" in the FMIA's preemption clause should be interpreted narrowly to allow the state to enact consumer protection labeling requirements. (*Ball, supra*, 424 F.Supp. at p. 766 [citing "the intent to benefit consumers" and the policy " 'to protect the health and welfare of consumers' " (*id.* at p. 767, italics omitted) as a ground for interpreting the term "labeling" to exclude state-required notices providing consumers with information].) We reject this view because it would effectively gut the FMIA's preemption clause. States generally enact labeling laws to protect or inform consumers. If Congress intended courts to interpret the FMIA's preemption provision to preserve state labeling laws intended to protect or inform consumers, few, if any, state law labeling requirements would be preempted. We will not interpret the FMIA's preemption provision in a manner that would read it out of existence. "Interpretive constructions which render some words surplusage, defy common sense, or lead to mischief or absurdity, are to be avoided." (*California Mfrs. Assn. v. Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836].)

In sum, we reject Leeman's view that *Allenby* and *Ball* are controlling here. Instead, we will apply *Kordel*'s approach to the term "labeling" in our analysis of the FMIA's preemption provision, as *Kordel* was the controlling law defining the term "labeling" in the FDCA at the time that Congress enacted the FMIA.

> e.   *Point of Sale Warnings Constitute "Labeling" Within the Meaning of the FMIA's Preemption Provision*

■   As we have explained, in *Kordel, supra,* 335 U.S. 345, 350, the Supreme Court stated that material "accompanies" a product, and thus constitutes "labeling" if there is a "textual relationship" between the material and the product. "One article or thing is *accompanied* by another when it supplements or explains it, in the manner that a committee report of the Congress accompanies a bill. No physical attachment one to the other is necessary." (*Ibid.,* italics added.) Material constitutes labeling if it "was designed for use in the distribution and sale" of the product. (*Ibid.*)

Applying that definition of "labeling" here, we inquire whether a point of sale warning with respect to meat constitutes labeling in that it "supplements or explains" the meat and is "designed for use in the distribution and sale" of the product. (*Kordel, supra,* 335 U.S. at p. 350.)

■   The declared purpose of Proposition 65's warning requirements is to protect the public's right " '[t]o be informed about exposures to chemicals that cause cancer, birth defects, or other reproductive harm.' " (Historical and Statutory Notes, 40E West's Ann. Health & Saf. Code (2006 ed.) foll. § 25249.5, p. 322.) To provide that information to consumers, Proposition 65 and its implementing regulations establish that consumers must be given a warning in a form that is "clear and reasonable." (Health & Saf. Code, § 25249.11, subd. (f); Cal. Code Regs., tit. 27, § 25603.1.) The warning must be "displayed at the retail outlet with such conspicuousness, as compared with other words, statements, designs, or devices in the label, labeling or display as to render it likely to be read and understood by an ordinary individual under customary conditions of purchase or use" (Cal. Code Regs., tit. 27, § 25603.1, subd. (c)), and must be "reasonably calculated, considering the alternative methods available under the circumstances, to make the warning message available to the individual prior to exposure" (Cal. Code Regs., tit. 27, § 25601).

Case law has discussed the importance of designing warnings to identify the specific consumer product that is the subject of the warning. (*Ingredient Communication Council, Inc. v. Lungren* (1992) 2 Cal.App.4th 1480, 1494–1495 [4 Cal.Rptr.2d 216] [concluding that a warning system using general signs and advertisements inviting consumers to call a toll-free number, but not identifying specific products, did not provide clear and reasonable warnings].) "[I]n the absence of a *specific warning*, most consumers assume the products they buy are safe." (*Id.* at p. 1495, italics added.) Consistent with the focus on specific consumer products, the safe harbor warnings set forth in the implementing regulations are required to specify that " '[*t*]*his product* contains a chemical known to the State of California' " to be a carcinogen or a reproductive toxin. (Cal. Code Regs., tit. 27, § 25603.2, subd. (a), italics added.)

■ In short, to comply with Proposition 65, point of sale warnings must be designed to effectively communicate to consumers that the specific product targeted by the warning is a carcinogen or a reproductive toxin. With this understanding of the nature of Proposition 65 point of sale warnings, we conclude that a properly designed point of sale warning will "supplement[] or explain[]" the meat offered for sale in that it will give consumers additional information about the product. (*Kordel, supra,* 335 U.S. at p. 350.) Further, a Proposition 65 point of sale warning will necessarily be "designed for use in the distribution and sale" of the product (*Kordel,* at p. 350), because it must be "likely to be read and understood by an ordinary individual under customary conditions of purchase or use" (Cal. Code Regs., tit. 27, § 25603.1, subd. (c)). Accordingly, based on the close "textual relationship" between the point of sale warning and the product to which it relates (*Kordel,* at p. 350), we conclude that a point of sale warning with respect to meat or meat products constitutes "labeling" within the meaning of the FMIA's preemption clause.

■ Thus, because (1) point of sale warnings are "labeling" within the meaning of the FMIA, and (2) there is no dispute that the warnings required by Proposition 65 are "in addition to, or different than" the labeling required by the FMIA (21 U.S.C. § 678), we conclude that the trial court properly ruled that Proposition 65's point of sale warning requirements with respect to meat are preempted by the FMIA.[38]

---

[38] We note that Leeman, and any other citizen concerned about the presence of harmful substances such as dioxins and PCB's in meat, are not without recourse. A party may file a petition with the USDA pursuant to 7 Code of Federal Regulations part 1.28 (2009) "for the issuance, amendment or repeal of a rule" to address the issue.

## DISPOSITION

The judgment is affirmed. The parties are to bear their own costs on appeal.

Haller, Acting P. J., and O'Rourke, J., concurred.

The petition of appellant Whitney R. Leeman for review by the Supreme Court was denied April 14, 2010, S179937. George, C. J., did not participate therein.